THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
SHERMAN WATSON, Appellant.

Second Department, April 9, 1984

**APPEARANCES OF COUNSEL**

*William E. Hellerstein* (*Barry S. Stendig* of counsel), for
appellant.

*Elizabeth Holtzman, District Attorney (Michael J. Halberstam, Barbara D. Underwood* and *Roseann B. MacKechnie* of counsel), for respondent.

OPINION OF THE COURT

MANGANO, J.

On this appeal from a judgment convicting defendant of the crime of murder in the second degree (two counts), he contends, *inter alia,* that Criminal Term committed reversible error in (1) denying those branches of his motion which sought to suppress the victim's watch, the defendant's statement of February 17, 1980 and the fruits of a search conducted on February 19, 1980 pursuant to a search warrant and (2) admitting into evidence at trial, under the present sense impression exception to the hearsay rule, a telephone conversation between the victim's friend and the victim shortly before her murder.

■■ We hold that (1) the victim's watch and the statement made by the defendant on February 17, 1980 must be suppressed and (2) the present sense impression exception to the hearsay rule is not applicable to the facts at bar and, therefore, the victim's friend should not have been allowed to testify at the trial with regard to a telephone conversation with the victim shortly before her murder. Accordingly, the judgment must be reversed and a new trial ordered.

I

Defendant's conviction of the crime of murder in the second degree arose out of the fatal beating of Mavis Carter sometime between 1:00 P.M. on February 15, 1980 and 1:00 P.M. on February 16, 1980. The victim was found in the bathroom of her apartment and the medical testimony established that she had been beaten to death with a blunt instrument. The door to the victim's apartment was found open with no evidence of forced entry.

At a combined *Mapp-Huntley* hearing conducted in February, 1981, the detective in charge of the murder investigation testified that on February 16, 1980, during the course of his investigation, he went to the building in which the victim lived, in order to interview the superintendent. The defendant identified himself as the superintendent and stated that his name was Robert Watson. The

detective advised the defendant that elimination finger-prints would be taken the following day of anyone who had legitimate access to the apartment.

On February 17, 1980, the defendant accompanied the detective to the police precinct, where elimination finger-prints were taken. The detective obtained defendant's date of birth, and during the fingerprinting, submitted this information and the name Robert Watson to the Bureau of Criminal Identification. The detective learned that the 77th Precinct had a "wanted" card for robbery for one Sherman Watson, with defendant's date of birth. Upon inquiry of the 77th Precinct, the detective was advised that the "wanted" card was active. Upon subsequent inquiry, defendant admitted that his name was Sherman Watson and not Robert Watson.

The detective then told defendant that there was a "wanted" card for him for robbery and read him his *Miranda* rights. The defendant was also told that he could not leave the precinct. Defendant denied knowledge of any robbery.

The detective then searched the defendant and found an antique gold watch in his pocket. The watch had an "M" inscribed on the case and a crystal missing. The detective took the watch to another room, in which the victim's daughter and son-in-law were present for the purpose of elimination fingerprinting. The daughter identified it as her mother's watch and told the detective that she had seen it in her mother's apartment about two weeks earlier.

The detective returned to the defendant a few minutes later and upon further questioning regarding the watch, defendant stated that it had been given to him about two months earlier by a girl who lived on Empire Boulevard near Troy Avenue. Defendant also denied that he had been in the victim's apartment on the day of the crime and offered an alibi. The detective observed some blood spots on defendant's tan shoes. The defendant explained the blood spots on his shoes by stating that he had broken up a fight in the apartment building several weeks earlier, and that a girl involved in that altercation had been bleeding.

At some point during this session at the precinct, the detective ascertained that the wanted card had been canceled.[1]

The defendant was released from police custody shortly thereafter, but before leaving the precinct he consented to a police search of his apartment. During a quick search of defendant's apartment the detective found a shirt which appeared to be stained with blood. However, the detective did not take the shirt or arrest the defendant at that time.

On February 19, 1980, the detective applied for and obtained a search warrant authorizing a search of defendant's apartment for the tan shoes with the apparent bloodstains which defendant had worn in the precinct two days earlier. The application for the search warrant listed the following factors in support thereof:

"That on February 15, 1980, the deceased told [a named witness] of Bklyn, N.Y., that the superintendent, Sherman Watson of 2921 Tilden Ave., Bklyn., N.Y., apt. 1D was in the deceased's apartment to fix a leak. This information was given to your deponent by [the witness].

"That on February 17, 1980, your deponent observed Sherman Watson to be in possession of a pocket watch identified by * * * the deceased's daughter, as belonging to the deceased.

"That on February 17, 1980, your deponent saw a spot of what appeared to be blood on Sherman Watson's shoe".

The detective executed the search warrant later that day. During the course of the search, he seized the shirt, which he had observed in the apartment two days earlier, from a hamper, and recovered a bloodstained pair of black rubber boots from between the boxspring and frame of defendant's bed. From within the left boot, the detective seized a bloodstained pair of pliers with a blue vinyl handle. The detective arranged for a forensic field team to test these items for the presence of blood. The test showed the presence of blood. The detective also testified that in searching the premises he did not search any areas or enclosures in which the tan shoes could not fit.

---

1. It is unclear from the record whether the warrant card was canceled or whether the detective learned that it was for another person with the same name.

The next day, i.e., February 20, 1980, defendant was arrested at his apartment by the detective, and another set of pliers was seized from a windowsill. At the precinct, the detective read the defendant his *Miranda* rights, and took defendant's tan shoes which he was wearing. The defendant expressed a desire to speak to the detective's commanding officer. The defendant admitted that he owned the boots and pliers and stated that he last used the boots to fix a flood in the basement of the apartment house and used the pliers to fix mailboxes. The defendant also told the detective's commanding officer that he was in his girlfriend's apartment on the day of the murder getting "high". The interrogation ended when the defendant asked to call an attorney.

At the combined *Mapp-Huntley* hearing, defendant's counsel moved to suppress, *inter alia,* (1) the victim's watch taken from defendant's person at the precinct on February 17, 1980, as well as the statement given by the defendant to the detective at the precinct on that date, and (2) the bloodstained rubber boots and pliers discovered by the police during the execution of the search warrant on February 19, 1980.[2]

With respect to the victim's watch and defendant's statement of February 17, 1980, counsel argued that (1) since the wanted card was canceled, the defendant's arrest for robbery on February 17, 1980 was without probable cause and therefore unlawful and (2) the watch and defendant's statement of that date had to be suppressed as the fruits of an illegal arrest.

With respect to the black rubber boots and pliers, defendant's counsel, in moving to "controvert the warrant", *inter alia,* argued that the items were impermissibly seized, since the search warrant only authorized a search of defendant's apartment for the purpose of locating the tan shoes worn by defendant at the precinct on February 17, 1980.

With respect to the defendant's arrest for robbery on February 17, 1980 based on a "wanted" card which was subsequently discovered to have been canceled, Criminal Term relied on *People v Lent* (105 Misc 2d 831) and held

---

**2.** It appears that no formal papers in support of a motion to suppress were ever filed by defendant.

that although the detective did eventually learn that the wanted card was invalid, his search of the defendant was made at a point in time when the detective had a good-faith belief that defendant was wanted for robbery. Criminal Term also held that defendant's statement to the detective on February 17, 1980 was voluntary and was made after *Miranda* rights had been given. Accordingly, Criminal Term denied defendant's motion to suppress the victim's watch and defendant's statement of February 17, 1980.

With respect to the boots and pliers seized during the execution of the search warrant on February 19, 1980, Criminal Term held that (1) there was "sufficient probable cause" for the issuance of the search warrant and (2) on the authority of *Coolidge v New Hampshire* (403 US 443), the black rubber boots and pliers were properly seized, since they were inadvertently stumbled on and observed in plain view "at a time the police were still looking for the authorized object of their search".

Following Criminal Term's ruling on the motion to suppress,[3] the prosecutor advised the court that he would seek to introduce evidence of a telephone conversation between a friend of the victim and the victim, shortly before her murder.

The court then read a statement given to the District Attorney prior to the trial by the victim's friend, wherein she related the following telephone conversation with the victim shortly before the murder:

THE COURT: All right, may I have the statement, please.

This statement is by [the witness] and it concerns a phone call that she called the deceased, and I'm quoting from the statement, [her] statement:

So I asked her, "You're having your supper, so I wouldn't disturb you."

She said, "No, it's all right. You talk to me." And while we talking [*sic*], the doorbell rang. She says, "Hold on."

When she went to the door and came back, she said, "The super come to check my bathtub. So if you have a chance, you could get back to me".

---

3. Criminal Term did grant that branch of defendant's motion which sought to suppress the shirt which was observed by the detective in defendant's apartment during the quick search conducted on February 17, 1980 and seized during the search conducted on February 19, 1980.

During the course of this pretrial statement, the witness was asked the following questions and gave the following answers:

QUESTION: Did you hear the doorbell ring over the phone?

ANSWER: No, I did not.

QUESTION: When you were talking to her did you hear any other voices in the apartment?

ANSWER: No, I did not * * *

QUESTION: How long did the conversation last between you and her?

ANSWER: Ten to fifteen minutes.

QUESTION: Did you call her back later on?

ANSWER: No, I did not.

QUESTION: Okay. Did she say anything else to you about the super?

ANSWER: Yes, she is going to let him in to check the tub for her because she has a leak.

Criminal Term ruled that it would allow the witness to testify at trial with regard to this conversation on the ground that it came within the "present sense impression" exception to the hearsay rule (see *People v Watson,* 109 Misc 2d 71). During the trial, the witness testified, over objection, to her conversation with the victim as follows:

Q I would like to bring you back in time to Friday, February 15, 1980. Did you have a conversation with Mavis Carter at some time on that day or evening?

A Yes, in the evening.

Q And would you please tell the members of the jury where you were and what time this conversation occurred.

A I was on my job, at about a quarter to seven, I called Mavis to tell her that I'm leaving to Boston for the weekend, so she must not call, because I won't be home. And I said to her, "Oh, I'm sorry Mavis. You're eating. So I call you back." * * *

Q All right, go ahead.

A So she said, "Yes, I'm eating * * * but that's all right, you can talk".

Then I told her that I was going over to Boston.

Q Did there come a time when something else occurred?

A Yes. She said to me to hold on, "Somebody at my door," and she went to the door.

Q Well, what did you hear at that time?

A Somebody call her at the door.

Q Now, as far as the phone went, I am saying did you hear someone walking? Did you hear someone place the phone down? * * *

A She put the phone down and went to the door.

Q You weren't there. You don't know where she walked to; is that correct?

A No, I don't know, but she told me she was going to the door.

Q Did there come a time when you had a further conversation with Mavis Carter?

THE COURT: When she came back.

THE WITNESS: She came back to me.

Q And what was the conversation you had with her at that time?

A She said to me, "The super is at the door. I am going to let him in, so call me back if you have time."

Q Did she mention to you any reason why the super was there? * * *

A She said that her tub have a hole, leak. Her tub has a leak and the super come to check it out. "So if you have some time, Gladys, please to call me back."

Q Did you call back?

A I didn't have the time. I never did get back to her.

On cross-examination, the witness again admitted, as she had previously admitted in her pretrial interview with the prosecutor, that during the conversation with the deceased, she did not hear knocking at the door or the door buzzer, and did not know if anyone actually entered the apartment at that time.

Testifying in his own behalf, defendant presented an alibi defense which was substantially corroborated by the testimony of his wife.

Defendant was thereafter found guilty of felony murder and intentional murder. The instant appeal ensued.

## II

We turn initially to the propriety of Criminal Term's denial of those branches of defendant's motion which sought to suppress the victim's watch and his statement to the detective at the precinct on February 17, 1980.

As previously noted, in its holding on this issue, Criminal Term relied on *People v Lent* (105 Misc 2d 831, *supra*). In *People v Lent* (*supra*, p 834) the court held, after noting

that there did "not appear to be any case law directly in point", that property seized incidental to a good-faith arrest, based on an arrest warrant which unbeknownst to the police had been vacated earlier in the day, need not be suppressed.

However, on December 23, 1981, subsequent to Criminal Term's decision in the case at bar, the Court of Appeals held to the contrary in *People v Jennings* (54 NY2d 518). In *People v Jennings* (*supra,* p 520) the Court of Appeals held that "an arrest made in reliance upon the computerized criminal record file of [a] defendant, which showed as outstanding a parole violation warrant which had in fact been * * * vacated four months before the arrest, is made without probable cause". The court in *People v Jennings* (*supra*) granted defendant's motion to suppress notwithstanding the alleged " 'good faith' " of the arresting officer in relying on the communication concerning the warrant (p 523).

Moreover, there can be no doubt that the holding of *People v Jennings* (*supra*) is applicable to the instant direct appeal from defendant's judgment of conviction. In *United States v Johnson* (457 US 537), the Supreme Court of the United States held that its decisions construing the Fourth Amendment (US Const, 4th Amdt) were to be applied retroactively to all convictions that were not yet final at the time the decisions were rendered, except where the decisions fell within "that narrow class * * * whose nonretroactivity is effectively preordained because they unmistakably signal 'a clear break with the past' " (see *United States v Johnson, supra,* pp 553-554, quoting from *Desist v United States,* 394 US 244, 248; see, also, *People v Langen,* 60 NY2d 170, 177-179). This court, in a recent decision, echoed the holdings in *United States v Johnson* (*supra*) and *People v Langen* (*supra*), when it stated (*James v Liberty Lines,* 97 AD2d 749): "Absent a sharp break in the web of the law, all cases on direct appeal must be decided in accordance with any principles newly enunciated by the Court of Appeals".

Clearly, *People v Jennings* (*supra*) did not represent a sharp break with the past. It "overruled no prior Court of Appeals precedents and merely presented that court with

its first opportunity" (*James v Liberty Lines, supra,* p 749) to pass on this particular aspect of the theory of good-faith reliance by the police.

Indeed, this court, citing *People v Jennings (supra),* recently reversed the judgment of conviction in *People v Lent* (105 Misc 2d 831, *supra*) which was relied on by Criminal Term in its decision denying defendant's motion to suppress the victim's watch and his statement of February 17, 1980 (see *People v Lent,* 92 AD2d 941). Accordingly, pursuant to *People v Jennings (supra),* the defendant's arrest for robbery on February 17, 1980 was unlawful, and the watch taken from him and the statement made by him on that date must be suppressed as poisoned fruits of that unlawful arrest (*Wong Sun v United States,* 371 US 471).

In an attempt to avoid the holding of *People v Jennings (supra)* and uphold the seizure of the victim's watch, the People argue on appeal for the first time that (1) even if the defendant's arrest for robbery on February 17, 1980 was unlawful, the record establishes that the police possessed sufficient information to detain and frisk the defendant on February 17, 1980; (2) a frisk, as opposed to a general search, was in fact conducted at the precinct on February 17, 1980; and (3) the victim's watch would have been inevitably discovered pursuant to that frisk. The People further argue that if the record is unclear as to the exact nature of the intrusion on defendant's person, it would be appropriate to remit the matter for a further hearing on this issue, since Criminal Term, in upholding the arrest, effectively precluded the People from pursuing this alternate theory at the suppression hearing.

We disagree.

It is true that the Court of Appeals has held that "fairness requires * * * that [the People] be given 'one full opportunity' to prove the admissibility of the evidence sought to be suppressed" and that the People will be given such an opportunity at a new hearing if " 'an error of law is committed by the hearing court which directly causes the People to fail to offer' " proof on another theory (*People v Payton,* 51 NY2d 169, 177, quoting from *People v Havelka,* 45 NY2d 636, 643; *People v Warren,* 81 AD2d 872).

However, these principles are totally inapplicable to the facts at bar. The detective testified, without any qualifications (and Criminal Term accepted his testimony) that he conducted a full search for "anything that [defendant] had". Accordingly, the People's argument with regard to a frisk must be rejected.[4]

■ Criminal Term did not err, however, in denying those branches of defendant's motion which sought to suppress the rubber boots and pliers which were seized during the search of defendant's apartment on February 19, 1980, pursuant to a search warrant. In so holding, Criminal Term was of the view that (1) there was probable cause to issue the search warrant on February 19, 1980 authorizing a search of defendant's apartment for the tan shoes worn by the defendant in the precinct on February 17, 1980 and (2) the detective had the right to seize the rubber boots (and the pliers contained therein) during the execution of that search warrant.

We agree with Criminal Term's holding in this regard.[5]

With respect to the issue of probable cause to issue the search warrant, it is true that the victim's watch, which we hold must be suppressed, was relied on by the detective in his application for the search warrant. However, even without consideration of the watch, the remaining facts in the application for the search warrant, i.e., (1) the detective's observation in plain view of the apparently blood-stained tan shoes worn by the defendant at the precinct on February 17, 1980, and (2) the information given to the detective by the victim's friend regarding her conversation with the deceased on February 15, 1980,[6] were sufficient to establish probable cause for the issuance of a search warrant for defendant's apartment.

---

4. Moreover, even assuming, *arguendo,* that the detective conducted a frisk of the defendant on February 17, 1980 and not a full search, the watch would not have been inevitably discovered as the People argue (see *People v McGriff,* 99 AD2d 818).

5. Although defendant's counsel at the suppression hearing stated that he wished to "controvert the warrant", he never pursued the probable cause argument at the hearing, or on appeal. At the hearing and again on appeal, counsel merely argued that the police had no right to seize the rubber boots and pliers during the search. However, since Criminal Term addressed the probable cause issue, we have done so as well.

6. The hearsay on hearsay nature of this information did not preclude it from being considered by a magistrate in deciding whether or not to issue a search warrant (see *United States v Smith,* 462 F2d 456; cf. *Jaben v United States,* 381 US 214).

With respect to the seizure of the rubber boots (and the pliers contained therein) from defendant's apartment, defendant does not dispute the fact that, during the execution of the search warrant, they were discovered inadvertently, and observed in plain view. Rather, defendant argues that (1) the plain view doctrine is inapplicable to homes and apartments and (2) since the search warrant did not particularly describe the items which were in fact seized, their seizure was illegal.

Both the Supreme Court of the United States and the courts of this State have rejected defendant's argument in this regard (*Coolidge v New Hampshire,* 403 US 443, *supra; People v Jackson,* 41 NY2d 146, 149-150; *People v Goscinski,* 66 AD2d 802; *People v Lenart,* 91 AD2d 132, 135; *People v Etoll,* 70 AD2d 739, 740; *People v Houle,* 85 AD2d 751, 752).

Accordingly, Criminal Term did not err in denying those branches of defendant's motion which sought to suppress the rubber boots and pliers which were found in defendant's apartment on February 19, 1980.

### III

We now turn to Criminal Term's evidentiary ruling allowing the victim's friend to testify as to her telephone conversation with the victim on February 15, 1980, shortly before her murder.

In admitting into evidence the testimony of the victim's friend regarding her telephone conversation with the victim, Criminal Term held that this testimony came within the "present sense impression" exception to the hearsay rule.[7]

In our view, this testimony does not fall within the present sense impression exception to the hearsay rule, and Criminal Term therefore erred in admitting it into evidence.

---

7. Criminal Term conceded that the present sense impression exception to the hearsay rule has been rejected by Wigmore (see 6 Wigmore, Evidence [Chadbourn rev, 1976], § 1757, p 238), and has "[h]eretofore * * * not been recognized by the courts of this State" (*People v Watson,* 109 Misc 2d 71, 73). However, Criminal Term noted that this exception to the hearsay rule is contained in subdivision (1) of rule 803 of the proposed New York Code of Evidence [1980 ed] and has been codified in the court rules of the Federal courts and at least 17 States (*People v Watson, supra,* pp 73, 74-75).

A statement "made out of court, that is, not made in the course of the trial in which it is offered, is hearsay if it is offered for the truth of the fact asserted in the statement" (Richardson, Evidence [Prince, 10th ed], § 200; see, also, Fed Rules Evid [US Code, tit 28], rule 801, subd [c]). In *Loschiavo v Port Auth.* (86 AD2d 624, affd 58 NY2d 1040), decided subsequent to the decision of Criminal Term, this court listed the present sense impression exception as one of the four types of evidence which can be admitted under the *res gestae* exception to the hearsay rule[8] (cf. *Hansell v Galvani,* 286 App Div 1019).

The present sense impression exception contained in subdivision (1) of rule 803 of the Federal Rules of Evidence (US Code, tit 28) provides as follows:

"Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"(1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter".

The exception is explained in the Advisory Committee Notes to rule 803 of the Federal Rules of Evidence[9] as follows (US Code Ann, tit 28, Fed Rules Evid, rule 803, p 584): "The underlying theory of Exception [paragraph] (1) is that substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation. Moreover, if the witness is the declarant, he may be examined on the statement. *If the witness is not the declarant, he may be examined as to the circumstances as an aid in evaluating the statement"* (emphasis supplied).

The Federal courts and several commentators have also opined that the present sense impression exception to the hearsay rule, as codified in the Federal Rules of Evidence,

---

**8.** The other specific components of the *res gestae* exception are (1) declaration of present bodily condition; (2) declaration of present mental states and emotions; and (3) excited utterances (*Loschiavo v Port Auth.,* 86 AD2d 624, affd 58 NY2d 1040).

**9.** The present sense impression exception to the hearsay rule contained in the proposed New York Code of Evidence is identical to the present sense impression exception contained in the Federal Rules of Evidence (see *People v Watson,* 109 Misc 2d 71, 73).

clearly requires the witness to have been present when the statement was uttered by the declarant. In *United States v Narciso* (446 F Supp 252, 288, quoting from 4 Weinstein & Berger, Weinstein's Evidence, par 803 [1] [01]), the court stated: " 'Underlying Rule 803(1) is the assumption that statements of perception substantially contemporaneous with an event are highly trustworthy because: (1) the statement being simultaneous with the event there is no memory problem; (2) there is little or no time for calculated misstatement; and (3) the statement is usually made to one who has equal opportunity to observe and check misstatements' ".

Another commentator on the present sense impression exception to the hearsay rule, as codified in the Federal Rules of Evidence, has stated (Comment, The Present Sense Impression Exception to the Hearsay Rule: Federal Rule of Evidence 803 [1], 81 Dick L Rev 347, 355): "The second safeguard that results from the requirement of contemporaneity is the opportunity to cross-examine the reporting witness concerning the fact and content of the statement. In the great majority of cases admitting unexcited contemporaneous declarations, the witness who heard the declaration also had substantial opportunity to observe the event or condition. When the witness is not the declarant, the requirement of contemporaneity ensures that the statement was made in the presence of a person capable of testing its accuracy by personal observation of the event. This opportunity for cross-examination provides assistance to the jury in its evaluation of the statement and protection against the danger that too much weight could be attributed to it" (see, also, Slough, Spontaneous Statements and State of Mind, 46 Iowa L Rev 244, 252).

Moreover, the three commentators cited by Criminal Term as having accepted the present sense impression exception to the hearsay rule have all based their conclusion on the assumption that the witness who testifies about the declarant's statement was also present at the event and observed the situation himself, thereby providing a check on the accuracy of the declarant's statements (see McCormick, Evidence [2d ed], § 298, p 710; Morgan, A Suggested

Classification of Utterances Admissible as Res Gestae, 31 Yale LJ 229, 236-237; Thayer, Bedingfield's Case-Declarations as a Part of the Res Gesta, 15 Am L Rev 1).

Since the victim's friend was not present to observe the event described by the victim and there were no other indicia of the statement's reliability, the testimony of the victim's friend did not come within the present sense impression exception, and was hearsay. Its admission into evidence was not only error, but error of constitutional dimension, i.e., a violation of defendant's right of confrontation. In *Ohio v Roberts* (448 US 56, 66) the United States Supreme Court held: "In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness".

Criminal Term also relied on four out-of-State cases as persuasive authority for admitting the challenged testimony into evidence. We find these cases neither binding nor persuasive.

In *State v Connley* (295 NC 327) the Supreme Court of North Carolina admitted into evidence the testimony of two police dispatchers with regard to a radio communication to them from an abducted State trooper wherein the State trooper (1) advised he was being forced by his abductor to drive to Atlanta and (2) his armed abductor was threatening to kill him should a rescue be attempted. An examination of the court's opinion in *State v Connley* (*supra*) reveals that the present sense impression exception was not relied on. Rather, the court held that the testimony was admitted under the general " 'res gestae concept' " and particularly under the specific exception that allows the admission of "[s]tatements made by a deceased immediately prior to or during the course of a continuing criminal transaction" (*State v Connley, supra,* p 344).

In *McCaskill v State* (227 So 2d 847 [Miss]) the defendant, a doctor, was tried for the murder of one of his

patients who had died during an illegal abortion. During the trial, the decedent's mother testified that after her daughter failed to return home from a party, she called a telephone number that she found in her daughter's room. She reached the defendant doctor and asked to speak to her daughter. The defendant initially advised her that her daughter was not in the office but after she persisted he gave the telephone over to her daughter. Over objection, the victim's mother testified that when she asked her daughter if she was all right, her daughter replied (*McCaskill v State, supra,* p 849): " '[Y]es, I am all right' * * * '[Y]es, I am sure. You know that — of my pregnancy — and I am up here to the doctor getting something done about it' ".

Again, without addressing the present sense impression exception, the Supreme Court of Mississippi held that the mother's testimony regarding her conversation with her daughter was admissible "as part of the *res gestae*" and that this type of evidence was "admissible in abortion cases as an exception to the hearsay rule" (*McCaskill v State, supra,* p 851).

In *Commonwealth v Coleman* (458 Pa 112) the homicide victim's mother was allowed to testify that her daughter called her at 6:15 A.M. on May 3, 1971 and told her that the defendant, who was her boyfriend and with whom she lived, (1) would not let her leave the apartment, (2) would hang up the telephone, and (3) was going to kill her. The telephone conversation was then broken off from the daughter's end and the mother called the police. Five minutes later, defendant, who was blood splattered and cut about the face and hands, hailed a patrol car and said that he had hurt his girlfriend. The girl's body was found with multiple stab wounds shortly thereafter. However, in *Commonwealth v Coleman (supra)* the mother also testified that the defendant could be heard during the telephone conversation shouting in the background, and the defendant himself testified that he and the victim had a loud argument immediately prior to the telephone call.

Based on these facts, the Supreme Court of Pennsylvania rejected defendant's argument that admission into evidence of the mother's testimony constituted reversible

error. Two of the seven Justices held in an opinion that "[i]n view of the facts and corroborative testimony of the appellant" (*Commonwealth v Coleman, supra,* p 119), the testimony could be admitted under the present sense impression exception to the hearsay rule. However, three Justices held in a separate concurring opinion that the mother's testimony was admissible solely under the " 'excited utterance' " exception to the hearsay rule and should not have been admitted on the basis of an "inapplicable exception", i.e., the present sense impression exception (*Commonwealth v Coleman, supra,* p 123).[10]

Finally, in *State v Flesher* (286 NW2d 215 [Iowa]), the decedent's paramour testified that he had a conversation with the decedent shortly before her murder. He testified that the conversation was cut short by a knock at the door. Over objection, he then gave the following testimony (p 216): "The first thing she said to me was, 'It's a man.' She went to the door and I could hear some conversation in the background, and she came back to the phone and she said, 'It's Joan,' [the defendant] and I said, 'Did you let her in?' And she said, 'Yes, I did.' I said, 'Well, just be careful.' She said, 'I will,' and I said, 'I'll talk to you later.' And she hung up". The defendant was convicted after trial. On appeal defendant argued that it was reversible error to admit into evidence the testimony of the deceased's paramour regarding his conversation with the deceased shortly before the murder. The conviction was initially affirmed by a split intermediate court, on the ground that the challenged testimony came within the present sense impression exception to the hearsay rule[11] (*State v Flesher,* 286 NW2d 218 [Iowa]), and thereafter by the Supreme Court of Iowa on the same ground (*State v Flesher,* 286 NW2d 215, *supra*).

The facts in *State v Flesher* (*supra*) are distinguishable from those at bar in that the witness testified that he heard

---

**10.** The two remaining Justices in *Commonwealth v Coleman* (458 Pa 112) concurred in result.

**11.** The dissenters in the intermediate appellate court of Iowa stated that "[i]n the absence of corroborative testimony of one who has had an equal opportunity for observation *or* substantial corroborative evidence, [we] consider the present sense impression testimony of the otherwise unavailable declarant to be inadmissible. The declarant's testimony in this case does not meet either criterion and should not have been admitted" (*State v Flesher,* 286 NW2d 218, 222 [Iowa]).

a knock at the victim's door and subsequent conversation between the victim and her visitor. In any case, we are not bound by the holding of the Supreme Court of Iowa.

## IV

■ ■ In conclusion, we hold that (1) those branches of defendant's motion which sought to suppress the victim's watch, and defendant's statement which was made to the police on February 17, 1980, should have been granted and (2) it was reversible error to admit into evidence, under the present sense impression exception to the hearsay rule, the testimony of the victim's friend regarding her telephone conversation with the victim shortly before her murder. Since there was a reasonable possibility that these errors contributed to defendant's conviction, the judgment of conviction must be reversed and a new trial ordered (*People v Almestica*, 42 NY2d 222, 226).

We have reviewed defendant's remaining arguments and find them to be without merit.

TITONE, J. P., O'CONNOR and BROWN, JJ., concur.

Judgment of the Supreme Court, Kings County, rendered April 24, 1981, reversed, on the law and the facts, those branches of defendant's pretrial motion which sought suppression of the victim's watch and defendant's statement which was made to the police on February 17, 1980 granted, and a new trial ordered.