THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SCOTT KERN, JASON LADONE and JON LESTER, Appellants.

Second Department, July 31, 1989

---

**APPEARANCES OF COUNSEL**

*Hoffman & Pollok (John L. Pollok, Charles L. Weintraub, Edward Gasthalter, Susan C. Wolfe* and *Michael Gold* of counsel), for appellants.

*Charles J. Hynes, Deputy Attorney-General (Arthur Weinstein, Matthew S. Greenberg, Hillel Hoffman* and *Virginia Modest* of counsel), for respondent.

*Caesar D. Cirigliano (Robert M. Baum, Arnold S. Cohen* and *Laura J. Miller* of counsel; *Gail Cagney* and *Harry Zirlin* on the brief), for Legal Aid Society, *amicus curiae.*

**OPINION OF THE COURT**

MOLLEN, P. J.

This appeal arises out of the highly publicized confrontation between a group of white teen-agers and three black men during the early morning hours of December 20, 1986, in Howard Beach, Queens County, which resulted in the death of one of the black men, Michael Griffith and the severe beating of his companion, Cedric Sandiford. The three defendants involved in this appeal, Scott Kern, Jon Lester and Jason Ladone, were convicted, after a joint jury trial, of manslaughter in the second degree and assault in the first degree as a result of their involvement in the events of that fateful night. Additionally, Kern and Lester were found guilty of conspiracy in the fifth degree. On appeal, the defendants contend, *inter alia,* that the evidence adduced at trial was legally insufficient to support their manslaughter and assault convictions, that their respective inculpatory statements made to the police

should have been suppressed, and that the trial court erred in ruling that the defense, in exercising its peremptory challenges, was required to articulate a race-neutral explanation for its challenges to black jurors. The defendants also challenge the propriety of certain trial rulings and they argue that their respective sentences were excessive. Based upon our review of the extensive trial record herein and our analysis of the issues raised on appeal, we conclude that the judgments of conviction should, in all respects, be affirmed.

## I. THE FACTS

### INTRODUCTION

Shortly after the occurrence of the "Howard Beach incident", which drew considerable public attention and outcry, a Special State Prosecutor was appointed *(see,* Executive Law § 63) to investigate the circumstances surrounding the attack and to prosecute those responsible. As a result of the ensuing investigation, the Grand Jury returned an eight-count indictment against Scott Kern, Jon Lester, Jason Ladone, Robert Riley,[1] Michael Pirone and seven other youths. Scott Kern and Jon Lester were charged with (1) the crimes of murder in the second degree (Penal Law § 125.25 [2]) and manslaughter in the second degree (Penal Law § 125.15 [1]) in connection with the death of Michael Griffith, (2) attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]) and assault in the first degree (Penal Law § 120.10 [1]) with regard to the attack on Cedric Sandiford in the vicinity of 156th Avenue in Howard Beach and (3) assault in the second degree (Penal Law § 120.05 [2]) as a result of the attack on Sandiford outside the New Park Pizzeria in Howard Beach. Jason Ladone was charged with (1) manslaughter in the second degree in connection with Griffith's death and (2) attempted murder in the second degree and assault in the first and second degree arising out of the attacks on Sandiford. Robert Riley was charged with murder in the second degree and manslaughter in the second degree in connection with Griffith's death, and criminal facilitation in the fourth degree (Penal Law § 115.00 [1]). Michael Pirone was charged with manslaughter in the

---

1. Pursuant to a written agreement with the Special State Prosecutor, Riley, in exchange for his cooperation, was permitted to plead guilty to one count of assault in the second degree in satisfaction of all charges arising out of his involvement in the Howard Beach incident *(see, People v Riley,* — AD2d — [decided herewith]).

second degree in connection with Griffith's death and assault in the second degree in connection with the attack on Sandiford near the New Park Pizzeria. All of the defendants were charged with riot in the first degree (Penal Law § 240.06). Additionally, Scott Kern, Jon Lester and Robert Riley were charged with conspiracy in the fifth degree (Penal Law § 105.05 [1]), and Jon Lester was charged with inciting to riot (Penal Law § 240.08). Kern, Ladone, Lester and Pirone were jointly tried before a jury.

HUNTLEY HEARINGS

A. Jason Ladone

On the afternoon of December 21, 1986, one day after the Howard Beach incident occurred, Detectives Francis Paulson and Richard Mandel went to the Ladone residence in Howard Beach and spoke with Jason Ladone's mother. The detectives advised Mrs. Ladone that they wished to speak to her 16-year-old son in connection with the December 20th incident. The detectives testified that they did not consider Ladone to be a suspect at that time. Mrs. Ladone informed the detectives that her son was at his job in Brooklyn and offered to accompany the detectives to that location. Before leaving her home, Mrs. Ladone attempted several times to contact Ladone's father, as well as their family attorney. Her efforts were unsuccessful.

The detectives and Mrs. Ladone left the Ladone residence at approximately 2:15 P.M. in the detectives' unmarked car and arrived in Brooklyn at Ladone's place of employment approximately one hour later. Upon their arrival, Mrs. Ladone exited the car and returned several minutes later with her son. The detectives informed Ladone of the purpose of their inquiry and, when asked if he had any information regarding the December 20th attack, he stated that he had no knowledge of the incident. A few minutes later, however, Ladone stated that he did have some information but that his involvement in the incident was limited to punching "a guy a few times". Ladone stated that he had "nothing to do with the death of the other guy". At that point, the detectives ceased their questioning and advised Mrs. Ladone that her son would be arrested. When Mrs. Ladone asked if her son needed an attorney, Detective Mandel replied "[i]t's up to you". No further reference to an attorney was made by Mrs. Ladone in the detectives' presence. The detectives, in compliance with Mrs. Ladone's request, returned her to her house in Howard

Beach and provided her with a paper containing their names and the telephone number of the 106th Precinct. The detectives advised Mrs. Ladone that if she had any questions as to where her son would be, she should contact the precinct in about an hour.

Thereafter, Ladone expressed a desire to cooperate with the police and the detectives brought him to the 112th Precinct so that he could view photographs in an attempt to identify the other persons involved in the attack. Upon his arrival at the precinct, Ladone was escorted to a room on the second floor and advised of his *Miranda* rights. Ladone signed a written waiver of his rights and, at approximately 4:15 P.M., provided an oral statement concerning his involvement in the attack. The statement was subsequently reduced to writing and signed by him. In his statement, Ladone recounted the events leading to the confrontation with the three black men and admitted to involvement in the subsequent chase and attack on those men. Sometime after Ladone provided the police with his written statement, he was transported to the 106th Precinct.

Meanwhile, Mrs. Ladone, after arriving home, continued her efforts to contact Ladone's father and their family attorney. Approximately 15 minutes after arriving home, she called the 106th Precinct and was advised that the detectives were not in the building. She eventually contacted Ladone's father at approximately 5:00 P.M. and, shortly thereafter, Mr. Ladone went to the 106th Precinct. Mrs. Ladone stated that Detective Mandel returned her phone call at approximately 6:00 P.M. but refused to respond to her questions concerning the whereabouts of her son. Mrs. Ladone finally contacted the family attorney at about 9:15 P.M. at his home. After receiving Mrs. Ladone's telephone call, the attorney telephoned the 106th Precinct and informed the police that he represented Ladone and that he was trying to locate him. The attorney was advised to contact the 112th Precinct. At approximately 11:15 P.M., the attorney located Ladone at the 106th Precinct.

The hearing court denied Ladone's motion to suppress his oral and written statements. The court initially found that Ladone's statement, made in his mother's presence in the police vehicle, was uttered before he was considered a suspect and that, therefore, *Miranda* warnings were not required. The hearing court noted that, while Mrs. Ladone did make inquiry concerning her son's need for legal representation, at no point did Ladone or his mother invoke Ladone's right to counsel.

Additionally, the court determined that Ladone's custodial statements were made after he had voluntarily and knowingly waived his *Miranda* rights and before anyone on his behalf had contacted the precinct to indicate that an attorney had been obtained for him.

## B. Scott Kern

On the evening of December 21, 1986, the police, based upon unconfirmed information provided by witnesses, came to believe that 17-year-old Scott Kern might have been a participant in the Howard Beach attack. Detectives Kelly and Fiorillo were instructed to proceed to the Kern residence for the purpose of interviewing him. The detectives arrived at the Kern home at approximately 3:30 A.M. and initially spoke to Scott's father. The detectives informed Mr. Kern that his son's name "came up" in the police investigation of the Howard Beach incident and they requested that Scott accompany them to the precinct. When Mr. Kern awakened his son, Scott told the detectives that he did not know anything about the attack. Mr. Kern and his son thereafter agreed to go to the precinct.

After their arrival at the 106th Precinct at approximately 4:10 A.M., the Kerns were escorted into an interview room and, when asked by the detectives what he knew about the incident, Scott said that "he had heard about it but he had not been a participant and had nothing to do with it". The detectives then left the room and conferred with several investigators who indicated that Scott had indeed been a participant in the attack. Detective Kelly reentered the room with Detective Mandel, and Scott was advised that he was under arrest and was given his *Miranda* rights. Scott acknowledged that he understood his rights and both he and his father signed a written waiver. Thereafter, Scott, in response to Detective Mandel's questions, made an oral statement which was later reduced to writing and signed by him. In his statement, Scott recounted the events of the late evening and early morning hours of December 19, and 20, 1986, and acknowledged his participation in the chase of the three black men. Although Scott disclaimed any involvement in the actual physical attacks, he did admit that, while the group of teenagers was at a nearby pizzeria shortly after the attack, he bragged to a deliveryman that he had hit one of the black men with a tree limb.

The hearing court denied Kern's motion to suppress his oral and written statements, finding that the statements were

made after he had been fully advised of his *Miranda* rights and after he had waived those rights in the presence of his father. The hearing court also ruled that there was no evidence of coercion or threats by the police in connection with the investigation and questioning of Kern.

## C. Jon Lester

At approximately 7:00 A.M. on December 22, 1986, based on positive witness identification as to Jon Lester's involvement in the Howard Beach incident, Lieutenant John Driscoll, the squad commander of the 106th Precinct, instructed Police Officer William Ahern and his partner to proceed to the Lester residence and to arrest him. The officers went to the Lester residence and placed the 17-year-old Lester under arrest. According to the hearing testimony, while en route to the 106th Precinct, Lester repeatedly inquired as to why he had been arrested. Officer Ahern, who initially refused to respond, thereafter stated, "you know what you're being arrested for". Lester then stated, "[i]t has something to do with those niggers the other night".

Lester arrived at the 106th Precinct at approximately 7:30 A.M. and was interviewed by Detective Paulson as to his pedigree. When the detective began to ask questions regarding the attack, Lester stated that he did not want to discuss the matter and requested an attorney. The detective then ceased his questioning. At approximately 9:00 A.M., Lester telephoned his mother and she later arrived at the precinct, provided her son with a change of clothing and then left. Officer Ahern remained in the room with Lester and, although they conversed, they did not speak further about the Howard Beach attack.

At approximately 11:30 A.M., Officer Ahern left the precinct to get something to eat. In response to the officer's inquiry, Lester requested a soda and gum. When the officer returned, he had with him a newspaper, a sandwich, gum and soda. The officer gave Lester one half of the sandwich together with the soda and gum that he had requested and when Lester asked to see the newspaper, the officer told Lester to wait until he had read it. When the officer eventually provided Lester with the newspaper, which contained a front-page headline about the Howard Beach incident, Lester read it and declared, "[t]his isn't what happened. It's not even close". At that point, Officer Ahern advised Lester, for the first time, of his *Miranda* rights and, after Lester signed the *Miranda* card, he stated that he

was willing to speak with the police in order to "clear [this] up". Thereafter, Detective Fiorillo elicited a lengthy statement from Lester regarding his involvement in the Howard Beach attack. At approximately 1:50 P.M., the detective ceased questioning Lester when he was informed that Lester's attorney had telephoned.

At approximately 1:00 P.M., Assistant District Attorney Brad Wolk arrived at the 106th Precinct to assist in the police investigation. While Wolk was standing in the squad room shortly before 2:00 P.M., Lester, who was seated, uncuffed, on a chair in an adjoining room, motioned to Wolk. Wolk recounted his conversation with Lester as follows: "[Lester] said to me, '[a]re you an attorney?' I said, '[j]ust so you know, I'm an Assistant District Attorney'. After I said that [Lester] motioned me towards him with a finger. I walked a few steps towards him and I stood next to him. [Lester] said * * * 'I know people are giving me up. I won't give anybody up. I was taught you don't rat on your friends, but I'll tell you what I did.' I stood there and he continued * * * 'I chased the taller black guy with a baseball bat and I struck him with the baseball bat, but I didn't chase the other guy.' Then he repeated again, 'I won't tell you what anybody else did. I was taught you don't rat on your friends' ". Following this conversation, Wolk walked away from Lester.

The hearing court ruled that Lester's declaration to Officer Ahern in the police car while en route to the precinct, as well as the lengthy statement made to Detective Fiorillo without the benefit of *Miranda* warnings and after Lester had invoked his right to counsel, were inadmissible at trial. The court, however, denied suppression of Lester's statement made to Officer Ahern upon viewing the newspaper, and his remarks to Assistant District Attorney Wolk on the basis that those statements were voluntarily and spontaneously made by Lester and not in response to police interrogation.

TRIAL

*The Prosecution*

During the early evening hours of December 19, 1986, Michael Griffith, Curtis Sylvester, Cedric Sandiford and Timothy Grimes left Brooklyn in a car driven by Sylvester and traveled to the home of Grimes' brother located in St. Albans, Queens County. Upon reaching their destination, they found that Grimes' brother was not at home and the foursome then

set out to return to Brooklyn. As they were traveling westbound on the Belt Parkway, their car began to overheat, forcing them to leave the parkway at the Cross Bay Boulevard exit in Queens. The group drove in a southerly direction on Cross Bay Boulevard through Howard Beach and continued for approximately 10 minutes towards the Rockaways. The car eventually came to a halt on the shoulder of Cross Bay Boulevard. Sandiford, Grimes and Griffith left Sylvester with the car, walked to a nearby bridge toll plaza and eventually returned to the disabled car with a container of water. Despite their efforts, the car remained inoperable and the men agreed that Griffith, Grimes and Sandiford would summon assistance and then return to Brooklyn. Sylvester intended to remain with the car and wait for a tow truck. Grimes, Griffith and Sandiford proceeded on foot northbound along Cross Bay Boulevard in search of a gas station and the train. The trio arrived in Howard Beach at approximately midnight.

Meanwhile, in Howard Beach, a birthday party was being held which was attended by approximately 30 teen-agers including Scott Kern, Jon Lester, Jason Ladone and Robert Riley. At approximately 12:20 A.M., Kern's girlfriend, Claudia Calogero, who had a 12:30 A.M. curfew, left the party and was driven home by Salvatore DeSimone. They were accompanied by Jon Lester and a fourth youth. As DeSimone was turning the corner from Cross Bay Boulevard onto 157th Avenue, Griffith, Grimes and Sandiford started to cross the street towards the New Park Pizzeria. According to Calogero's testimony, three black men darted in front of the car forcing DeSimone to stop the car suddenly. An argument ensued between the pedestrians and the occupants of the car. According to Calogero's testimony, Sandiford stuck his head in the car window and stared at the teen-agers. According to Sandiford's testimony, however, the occupants of DeSimone's car stuck their heads out the window and yelled "Nigger[s], get [out of] the neighborhood". Following that confrontation, the three black men crossed the street and entered the pizzeria. The youths continued on their way. After bringing Calogero home, DeSimone, Lester and the other youth returned to the party.

Robert Riley was sitting on the outside steps of the house where the party was being held, when DeSimone, Lester and the other youth arrived. Lester shouted, "There were some niggers on the boulevard, let's go up there and kill them". A few minutes later, a number of youths, including Kern, Les-

ter, Ladone and Pirone, left the party to track down the three black men. DeSimone led the caravan of cars from the party to the New Park Pizzeria in his car with Lester and Ladone. Riley followed in his own car with three male teen-agers and Laura Castagna, whom Riley intended to escort home. John Saggese followed the group in his car. Although Riley did not know which car Kern and Michael Pirone had traveled in, he observed the two when the group eventually arrived at the pizzeria.

Meanwhile, at approximately 12:45 A.M., Grimes, Sandiford and Griffith, who had finished eating their pizza in the New Park Pizzeria, exited the restaurant. At that point, the several vehicles containing the teen-agers pulled into the parking lot outside the pizzeria and the youths, with the exception of Laura Castagna, emerged from the cars. The group, wielding bats and sticks, confronted Griffith, Grimes and Sandiford outside the pizzeria and shouted, "Niggers get * * * out of the neighborhood". Riley testified that Kern was banging a base-ball bat on the ground as the teen-agers formed a semicircle around the three black men who, according to Riley, were each holding a knife. According to Grimes, several of the youths were carrying bats and sticks, and one youth held "something that looked like an iron pipe". Sandiford testified that he did not have a weapon and that he did not observe whether Griffith or Grimes displayed any weapons. Grimes testified that he pulled out a knife and held it in front of him as the youths approached. At that point, Sandiford was struck in the back by a bat. Although Riley never saw Kern swing the bat that he had been holding, he did testify that after Sandiford was struck, Riley grabbed the bat from Kern be-cause he (Riley) said he could swing it "harder". As the three black men began to flee across Cross Bay Boulevard, Riley, Kern, Ladone, Lester, Pirone, and several other youths gave chase.

Griffith, Grimes and Sandiford ran in different directions. Grimes headed north on Cross Bay Boulevard and managed to escape his attackers. Sandiford was struck several times with bats and tree limbs by his assailants as they continued to chant, "Niggers, get * * * out of the neighborhood". Sandiford was able to break away from the youths. He was eventually joined by Griffith as they ran north down an alleyway behind several stores located parallel to Cross Bay Boulevard. The two men were followed by Kern, Ladone, Lester, Riley, Pirone and two other youths. The alleyway ended at a three-foot-high

barricade where it intersected with 156th Avenue. Both Sandiford and Griffith jumped over the barricade and made a left turn on 156th Avenue. They were still being followed by the group of teen-agers who were approximately 30 feet behind.

The youths jumped over the barricade and continued the chase. Riley, who also climbed over the barricade, got into the back seat of Saggese's car which had just pulled up and proceeded westbound on 156th Avenue closely behind the other youths who were on foot. At the intersection of 90th Street and 156th Avenue, Griffith turned right onto 90th Street and proceeded north. He was followed by Saggese's vehicle which pulled up ahead of Kern, Lester, Ladone, Pirone and the other youths who were on foot. A three-foot-high guardrail was located at the end of 90th Street separating 90th Street from the Belt Parkway, a six-lane highway which runs east to west. Shore Parkway, a service road for the Belt Parkway, which also runs east to west, partially intersects 90th Street at the guardrail on the easterly side and leads to Cross Bay Boulevard. After the Saggese car came to a halt about three quarters of the way down 90th Street, Lester ran over to the car, grabbed a bat from Riley, and he and Riley, Kern and Ladone ran toward the end of 90th Street after Griffith. Griffith jumped over the guardrail and ran onto the Belt Parkway. When the youths reached the guardrail, Riley observed Griffith run across the three eastbound lanes of the highway, jump the center median and enter the westbound lanes, where he was struck by a vehicle being driven by Dominic Blum. As a result of the impact, Griffith was propelled 10 feet into the air and thrown approximately 75 to 125 feet forward where he landed on the highway pavement. The impact was so severe that one of Griffith's legs was partially amputated and he suffered an open skull fracture as well as numerous contusions and other fractures.

Blum testified that, as he was driving on the highway in the vicinity of the Cross Bay Boulevard exit, he was in the left westbound lane of the highway. The car in front of him slowed down and instead of applying his brakes, Blum proceeded to move over to the middle lane. At that point, Blum heard a "bang". Noticing that his windshield was cracked, Blum pulled over onto the right shoulder of the highway. Unaware of what he had hit, Blum looked back onto the highway and, after he observed that the traffic appeared to be flowing normally, he resumed his trip to Brooklyn. Blum explained that he had never considered the possibility that he

had struck a person. When he arrived home, Blum realized the full extent of damage to his car and, after speaking with his father, Blum and his father returned to the scene of the accident where they spoke to the police.

Meanwhile, several motorists who had observed Griffith's body lying in the highway proceeded to the nearest exit and telephoned the police. The first telephone call received by the police regarding the incident was recorded at 12:55 A.M. At about that time, Grimes was seen running down the westbound shoulder of the highway. Grimes approached one of the motorists who had pulled over to the shoulder near Griffith's body, and asked for a ride. He was refused. Shortly thereafter, Grimes secured a ride to a nearby train station.

After the youths had observed Griffith being struck by Blum's vehicle on the Belt Parkway, Riley returned to the car with Saggese, Pirone and a third youth. Lester, who was still carrying a bat, together with Kern and Ladone, ran past the car toward 156th Avenue where they met two other youths. The occupants of the Saggese vehicle drove back to the parking lot near the New Park Pizzeria where Riley exited the car and rejoined Laura Castagna, who had been waiting for him. The remaining three youths in the car made a U-turn and headed towards 156th Avenue.

Sandiford, who had managed to temporarily escape his assailants, was walking west on 156th Avenue when he was attacked from behind by the group of teen-agers who beat him with bats and tree limbs. Sandiford stated that he managed to grab the bat being wielded by Lester as he pleaded, "Please, oh God, don't kill me, I have a son like * * * you". At that point a car pulled up and, as its occupants exited the car and approached, Sandiford released the bat which Lester then swung at Sandiford, striking him in the head and causing blood to run down the back of his head. Sandiford stated, "I fe[lt] like my brain * * * busted apart".

Sandiford broke away from his attackers and ran across the street but was eventually caught by them. They continued to hit him with "bats and tree limbs". The chase ended when Sandiford tried to climb a chain link fence which ran parallel to the Belt Parkway. The youths pulled Sandiford down from the fence, kicking and beating him. Sandiford cried for help to Theresa Fisher, who was standing in the doorway of a house across the street. In response to Sandiford's cries, Fisher called the police. A redacted tape recording of Ms. Fisher's

telephone call, which was received by the 911 police emergency operator at 12:52 A.M., was admitted into evidence after Ms. Fisher testified at trial as to her observations that evening.

The beating of Sandiford continued even though he had managed to run to a grassy area diagonally across from the house occupied by Ms. Fisher. Sandiford was again knocked onto the ground and upon being hit in the eye, exclaimed "Oh God, I'm dead", covered his face with his hands and lay on the ground. The beating eventually ended and the assailants entered their cars and left the area. The final attack was witnessed by George and Marie Toscano, who also telephoned the police.

Shortly after his attackers left, Sandiford stood up and observed an unidentified individual crawl through a hole in the fence which bordered the eastbound lanes of the Belt Parkway. Sandiford passed through the fence as well and, upon seeing one of the cars containing two of his assailants, ran across the parkway to the westbound side and began running towards Brooklyn. As he ran through a construction site on the parkway, he threw highway cones onto the roadway to attract the attention of passing motorists. A police vehicle stopped, picked Sandiford up and brought him to the area where Griffith's body was located. Sandiford described his physical condition at that time: "My eyes [were] swollen up and busted up. The left eye was half-inch closed up. There were black and blue marks all over my body. My head was busted".

At approximately 2:00 A.M., Sandiford, who was bleeding from his eye and the back of his head, was escorted to Griffith's body and made a positive identification. Sandiford became hysterical and was placed in the rear seat of the police car. He refused medical treatment at the scene; however, after he was transported to the 106th Precinct at approximately 3:00 A.M., he agreed to accept such treatment. An emergency medical technician examined Sandiford at approximately 4:30 A.M., and observed numerous contusions and bleeding lacerations on the back of Sandiford's head, face, arms, legs and back. Sandiford's right eye was swollen. He was later transported to Jamaica Hospital where he was treated for his injuries.

Lester, Pirone, DeSimone and a fourth teen-ager returned to the party approximately 40 minutes after their departure. At that time, Lester was holding a wooden bat.

In addition to the various statements made to the police by Kern, Ladone and Lester, each of which was redacted to delete references to the other defendants, the prosecution also entered into evidence a redacted version of a statement made by Pirone on December 22, 1986, at the 106th Precinct in the presence of his father. In his statement, Pirone admitted his involvement in the initial confrontation with the three black men outside the pizzeria; however, he stated that he did not see anyone hit Grimes, Griffith or Sandiford nor did he see any of the youths display a bat or a weapon. Pirone stated that he did not join the chase of the black men because of a difficulty he had with his legs as a result of a prior accident. Pirone stated that while the chase was in progress, he walked across Cross Bay Boulevard toward 157th Avenue and continued in the direction of his house. When Pirone reached the vicinity of 187th Street, Saggese pulled up in his car, picked up Pirone and they returned to the party.

The results of the autopsy performed on Michael Griffith established that he was killed almost instantaneously upon being struck by Blum's vehicle. Additionally, expert testimony was presented to establish that, based upon an analysis of Griffith's urine and brain tissue, Griffith had ingested cocaine at least 10 hours prior to his death and that, since the effects of cocaine last no longer than six hours, Griffith was not under the influence of cocaine at the time of his death.

### The Defense

Detective Robert Howell and Sergeant Harold Knorr spoke to Sandiford on several occasions, beginning on December 20, 1986. During their questioning concerning his confrontation with the white teen-agers, Sandiford stated that he and Griffith had run down 156th Avenue and that the initial attack occurred at or near the intersection of 87th Street and 156th Avenue. Sandiford further indicated that after he had managed to flee, he was beaten again near 86th Street. It was at that point that Sandiford observed Griffith, who was being chased, pass through a hole in a fence separating 156th Avenue from the Belt Parkway. The youths did not follow Griffith. Sandiford feigned unconsciousness and, when his attackers left the area, he ran through the hole in the fence and proceeded westbound. At that time, Sandiford heard "a noise [or] a boom". A similar account of the events surrounding the attack was given by Sandiford to an Assistant District Attorney on December 22, 1986.

Scott Kern's father, who did not testify at the *Huntley* hearing, testified at the trial as to the events of December 22, 1986, when his son was questioned by the police. Mr. Kern testified that while he and his son were at the precinct, his son informed the police that on the night in question he had ridden to the New Park Pizzeria with four youths and, when they arrived outside the pizzeria, he observed three black males, one of whom had a knife and another had "a very pointy object". The three black males started to run across Cross Bay Boulevard and the teen-agers ran after them. According to Mr. Kern, his son stated that he had stopped on the center median of the roadway because of the passing traffic. Thereafter, he followed the group down the alleyway behind the stores near Cross Bay Boulevard and, at that time, observed Riley jump over the barricade at the end of the alley with another youth passing a baseball bat. According to Mr. Kern, his son stated that he had difficulty climbing over the barricade and by the time he came out on 156th Avenue, he had lost sight of the youths. A few minutes later, while Scott was standing near 88th Street and 156th Avenue, Saggese pulled up in his car, picked him up, and they returned to the party.

Mr. Kern further testified that while his son was recounting the events surrounding the incident, Detective Paulson made remarks indicating that he did not believe Scott's story. Similarly, Detective Mandel continually stated that he wanted Scott to tell the truth. After his son gave his statement, the police kept Mr. Kern and his son at the precinct and, at approximately 8:00 A.M., Scott was advised of his *Miranda* rights. Mr. Kern, who stated that he was in a confused state at the time, and his son both signed the *Miranda* card. Mr. Kern stated that his son never made a statement to the officers after receiving his *Miranda* warnings and that, at that point, Mr. Kern requested an attorney. Mr. Kern testified that the police did not advise them that Scott was being placed under arrest until approximately 11:30 P.M.

Dr. Thomas Manning, a toxicologist, who reviewed the autopsy and toxicological reports regarding Michael Griffith, testified that based upon his review of the reports, it was his opinion that Griffith had ingested cocaine approximately 15 minutes to two hours before his death. Accordingly, he concluded that Griffith was under the influence of the drug at the time of his death.

### Jury Charge

In connection with the fourth count of the indictment, assault in the first degree (i.e., intentionally causing serious physical injury to another by means of a dangerous instrument [Penal Law § 120.10 (1)]), which concerned the attack on Sandiford in the vicinity of 156th Avenue, the defendants requested a charge on the lesser included offense of assault in the second degree (Penal Law § 120.05 [2] [intentionally causing physical injury to another by means of a dangerous instrument]). The court agreed to the defendants' request based on the court's expressed belief that a question of fact existed as to the seriousness of the injuries sustained by Sandiford as a result of that attack. When the court denied the defendants' request for a charge of assault in the third degree (Penal Law § 120.00 [1] [intentionally causing physical injury to another]), the defendants sought to withdraw their prior request that assault in the second degree be charged. The court rejected that request and the defendants objected to that ruling.

In its charge concerning the count of manslaughter in the second degree, the court explained the concept of causation and advised the jury that it should consider whether Griffith's alleged impaired state by the ingestion of cocaine and/or Blum's alleged negligent operation of the automobile which struck Griffith constituted intervening acts which were the direct cause of Griffith's death.

Following the court's jury charge, the defendants renewed their request for a charge on the lesser included offense of assault in the third degree. That request was again denied.

### Jury Verdict

The jury found Kern and Lester guilty of manslaughter in the second degree in connection with Griffith's death, guilty of assault in the first degree with respect to the attack on Sandiford and guilty of conspiracy in the fifth degree. Ladone was found guilty of manslaughter in the second degree and assault in the first degree. Pirone was acquitted of all charges.

### Sentence

Lester, who had a prior conviction for criminal possession of a weapon in the third degree for which he had been adjudicated a youthful offender and sentenced to 1 to 3 years' imprisonment therefor, was sentenced on January 22, 1988, to consecutive terms of 5 to 15 years' imprisonment on his

manslaughter and assault convictions. He also received a concurrent term of one year imprisonment on the conspiracy count. Lester's application for a stay of execution of his sentence was denied by order dated February 29, 1988, and he is presently incarcerated.

On February 5, 1988, Kern was sentenced to consecutive sentences of 3 to 9 years' imprisonment on the manslaughter in the second degree and assault in the first degree counts. Those sentences were to run concurrently with Kern's one-year term of imprisonment for his conviction of conspiracy in the fifth degree. Kern's sentence was stayed pending appeal *(see, People v Kern,* 137 AD2d 862).

Ladone was sentenced on February 11, 1988, to consecutive sentences of 2½ to 7½ years' imprisonment on the manslaughter in the second degree and first-degree assault convictions respectively. Ladone's sentence was stayed pending appeal by order dated February 11, 1988.

II. THE LAW

### MANSLAUGHTER IN THE SECOND DEGREE

■ The defendants maintain that the evidence adduced at trial was legally insufficient to establish their guilt of manslaughter in the second degree (Penal Law § 125.15 [1]) in connection with the death of Michael Griffith. The defendants assert that their actions, insofar as Griffith was concerned, amounted to no more than a chase through the streets of Howard Beach while screaming racial epithets which ended when Griffith jumped over the barricade at the end of 90th Street. In the defendants' view, the evidence demonstrated that by the time Griffith climbed over the barricade, the defendants had, in large measure, given up their chase and, thus, it would require a "quantum leap in logic" to find that any of the defendants were aware of a grave risk of death to Griffith, that they disregarded that risk and that their conduct constituted a gross deviation from the standard of conduct that a reasonable person would have observed under the circumstances. Additionally, the defendants take the position that the evidence adduced at trial on the issue of causation was legally insufficient and that, in any event, two intervening acts took place which broke the chain of causation between their actions and Griffith's subsequent death; to wit, Blum's negligent operation of his vehicle and Griffith's intoxicated state by reason of his ingestion of cocaine. We disagree.

It is well established that the standard for appellate review of the legal sufficiency of evidence of guilt in a criminal case is whether " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " *(People v Contes,* 60 NY2d 620, 621, quoting *Jackson v Virginia,* 443 US 307, 319; *see, People v Bleakley,* 69 NY2d 490). Manslaughter in the second degree, as charged herein, is defined as "recklessly caus[ing] the death of another person" (Penal Law § 125.15 [1]). The term "recklessly" is defined as "[a] person acts recklessly with respect to a result * * * when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes *a gross deviation from the standard of conduct that a reasonable person would observe* in the situation" (Penal Law § 15.05 [3] [emphasis added]). A defendant's awareness of the risk created by his conduct dictates the degree of his culpability *(see, People v Montanez,* 41 NY2d 53). Thus, if a defendant fails to perceive a substantial and unjustifiable risk created by his actions, he may be found to be guilty of criminally negligent homicide but not of reckless homicide (Penal Law § 125.10). However, if the defendant is aware of the risk of death and consciously disregards it and the risk is of such a nature that disregard thereof is a gross deviation of the standard of conduct that a reasonable person would have observed under those circumstances, he is guilty of reckless manslaughter in the second degree if death results (Penal Law § 125.15 [1]; *see, People v Licitra,* 47 NY2d 554; *People v Montanez, supra,* at 57). The varying degrees of culpability, i.e., recklessness and criminal negligence, are not capable of direct proof, but rather are to be inferred from the facts and circumstances of a particular case and involve " 'fine gradations along but a single spectrum of culpability' " *(People v Green,* 56 NY2d 427, 432, quoting *People v Stanfield,* 36 NY2d 467, 473).

The evidence adduced at trial, when viewed in a light most favorable to the prosecution, provided more than a sufficient basis upon which a rational trier of fact could have determined that the defendants, who were thoroughly familiar with the area in which the events occurred, were aware that their actions in continuing to chase and threaten Griffith as he ran to the end of 90th Street, leaped over the barricade and ran onto the Belt Parkway created a grave risk of death to Griffith

which risk the defendants were aware of and consciously chose to disregard *(see, Matter of Anthony M.,* 63 NY2d 270; *People v Heinsohn,* 92 AD2d 574, *affd* 61 NY2d 855). The geographic layout of the area at the end of 90th Street was such that Griffith had a choice of either turning onto Shore Parkway, which would have led him back to Cross Bay Boulevard, or climbing over the barricade which separated 90th Street from the Belt Parkway. By this point in time, Griffith had been physically threatened and continually chased by the defendants and their cohorts through the streets of Howard Beach, an area unfamiliar to Griffith, during the dark morning hours of December 20, 1987. When he reached the end of 90th Street, Griffith, with his assailants in close pursuit, obviously concluded that if he turned right onto Shore Parkway, his assailants would continue to follow and inflict injury or death upon him if they caught him. Similarly, if he climbed the barricade and ran along the shoulder of the parkway, rather than cross it, the youths, who did not display any signs of abandoning their chase, would in all likelihood continue to follow him. Moreover, contrary to the defendants' assertions, the evidence clearly established that the defendants did not abandon their chase of Griffith once they reached 90th Street. In fact, the evidence, when viewed in the light most favorable to the prosecution, established that the defendants exhibited little, if any, signs of abandoning their pursuit until Griffith ran across the parkway and they saw him struck by a passing motorist. Under these circumstances, the evidence was legally sufficient to support the jury's finding that the defendants perceived a grave risk of death to Griffith by chasing him onto the Belt Parkway, that they consciously chose to disregard that risk and that, in doing so, the defendants grossly deviated from the standard of care which reasonable persons would have observed under the circumstances.

We note that the defendants' reliance on the case of *People v Montanez* (41 NY2d 53, *supra)* on this point is misplaced. Therein, the evidence established that the defendant and the decedent, who were long-time friends, were in the kitchen of the decedent's apartment while the decedent's wife and several other individuals were in the living room. A loud popping sound emanated from the kitchen and the decedent staggered into the living room holding his bloody neck and yelling to the defendant, "What did you shoot me with?". The defendant, who was observed holding a small revolver, replied that he was just "showing it to him" and he did not mean to do it.

The defendant was convicted of reckless manslaughter. However, on appeal, the Court of Appeals reversed the conviction and dismissed the indictment due to the lack of legally sufficient evidence to establish that the defendant acted recklessly. The *Montanez* court noted that the two men were alone in the kitchen when the shot was fired and, even though the jury could have concluded from the statements made after the shooting that the defendant was in possession of the gun when it discharged, "there is nothing which leads inescapably to the conclusion that the defendant was responsible or that his conduct * * * constituted 'a gross deviation from the standard of conduct that a reasonable person would observe in the situation' (Penal Law § 15.05, subds 3, 4)" *(People v Montanez, supra,* at 57). In the case at bar, however, the jury could readily conclude that the defendants' continued hot pursuit of Griffith as he fled onto the Belt Parkway demonstrated both an awareness of the grave risk posed by crossing a six-lane highway in the dark hours and a conscious disregard of that risk amounting to a gross deviation from the standard of conduct that a reasonable person would have observed under these circumstances (Penal Law § 15.05 [3]).

Furthermore, under these circumstances, the defendants' actions were a "sufficiently direct cause" of Griffith's ensuing death so as to warrant the imposition of criminal liability *(People v Kibbe,* 35 NY2d 407, 413; *see also, People v Stewart,* 40 NY2d 692, 697). To this extent, this case is strikingly similar to *Commonwealth v Joyce* (18 Mass App 417, 467 NE2d 214) which involved a chase through the streets of south Boston of a black male and his white companion by several white men, including the defendants, who were shouting threatening racial slurs. The chase concluded on a platform of a nearby train station. The black male, fearing for his life, attempted to escape by jumping upon the tracks. Within minutes, he was struck and killed by an oncoming train. The *Joyce* court found the defendants' claim, that there existed insufficient evidence that their attack on the decedent was the proximate cause of his death, to be without merit. The court stated, "[w]e reject the claims, as there was evidence that [the decedent] took the only route of escape and that once on the tracks, he had no reasonable alternative but to continue to run or walk along them until he reached the next station, or at least a point beyond where he was killed * * * The defendants' actions need not have been the sole cause which contributed to [the decedent's] death" *(Commonwealth v Joyce,*

*supra,* 467 NE2d, at 217; *see, People v Kibbe,* 35 NY2d 407, 412, *supra).*

Similarly, in *People v Kibbe (supra),* the defendants, who had been in a bar drinking with the obviously inebriated decedent, offered him a ride. While the decedent was in the vehicle, the defendants proceeded to rob him. The decedent was forced out of the vehicle, on an unilluminated rural highway, without his shoes, eyeglasses or outer clothing, and with his trousers pulled down around his ankles. There was several inches of snow on the shoulder of the highway. Sometime after the decedent was forced out of the defendants' vehicle, the decedent was struck and killed by a passing motorist as he sat in the middle of the roadway. The defendants were ultimately convicted of murder in the second degree. The *Kibbe* court, in rejecting the defendants' claim that the prosecution failed to prove beyond a reasonable doubt that they caused the decedent's death, stated: "We subscribe to the requirement that the defendants' actions must be *a sufficiently direct cause* of the ensuing death before there can be any imposition of criminal liability, and recognize, of course, that this standard is greater than that required to serve as a basis for tort liability. Applying these criteria to the defendants' actions, we conclude that their activities * * * were a sufficiently direct cause of the death of [the decedent] so as to warrant the imposition of criminal sanctions. In engaging in what may properly be described as a despicable course of action, [the defendants] left a helplessly intoxicated man without his eyeglasses in a position from which, because of these attending circumstances, he could not extricate himself and whose condition was such that he could not even protect himself from the elements. The defendants do not dispute the fact that their conduct evinced a depraved indifference to human life which created a grave risk of death, but rather they argue that it was just as likely that [the decedent] would be miraculously rescued by a good samaritan. We cannot accept such an argument. There can be little doubt but that [the decedent] would have frozen to death in his state of undress had he remained on the shoulder of the road. The only alternative left to him was the highway, which in his condition, for one reason or another, clearly foreboded the probability of his resulting death" *(People v Kibbe, supra,* at 413).

Similarly, in the case at bar, the only reasonable alternative left open to Griffith while being persistently chased and

threatened by the defendants and their friends, several of whom were carrying weapons, was to seek safety by crossing the parkway where he unfortunately met his death. Clearly, on the basis of these facts, it cannot be said that the defendants' despicable conduct was not a sufficiently direct cause of Griffith's death (see, People v Kibbe, 35 NY2d 407, supra). The defendants will not be heard to complain that, in desperately fleeing their murderous assault, Griffith chose the wrong escape route.

■ The defendants' further assertion that Blum's alleged negligent operation of his vehicle was an intervening proximate cause of Griffith's death is also without merit. Based on the circumstances surrounding the incident, including the dark early morning hour, it cannot be said that an intervening wrongful act occurred to relieve the defendants from the directly foreseeable consequences of their actions (see, People v Kibbe, 35 NY2d 407, 413, supra). Moreover, even if we assume that Blum was less than cautious in the operation of his vehicle, the facts demonstrate that his actions were not the sole cause of Griffith's ensuing death since it was the defendants' wrongful conduct which forced Griffith to seek refuge from his assailants by crossing the highway (see, Matter of Anthony M., 63 NY2d 270, 280, supra; LaFave and Scott, Criminal Law § 35, at 258-261). Additionally, although the defendants introduced some evidence to indicate that Griffith may have been under the influence of cocaine at the time of his death, there was more than sufficient evidence presented by the prosecution upon which the jury could have found that Griffith was not under the influence of cocaine at the time he was chased onto the Belt Parkway and ultimately to his death.

### ASSAULT IN THE FIRST DEGREE

■ The defendants also assert that the evidence adduced at trial was legally and factually insufficient to support their convictions for assault in the first degree. In particular, the defendants contend that the evidence failed to establish that Sandiford sustained "serious physical injury" as a result of the attack within the meaning of Penal Law § 120.10 (1), § 10.00 (10). We disagree.

The provisions of the Penal Law define the different degrees of assault on the basis of, among other factors, the extent of the injury sustained by the victim. Thus, an individual is guilty of assault in the first degree when, inter alia, "[w]ith

intent to cause *serious physical injury* to another person, he causes such injury * * * by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.10 [1] [emphasis added]). One is guilty of assault in the second degree when, *inter alia*, "[w]ith intent to cause *physical injury* to another person, he causes such injury * * * by means of a deadly weapon or a dangerous instrument" (Penal Law § 120.05 [2] [emphasis added]). The term "serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, *protracted impairment of health* or protracted loss or impairment of the function of any bodily organ" (Penal Law § 10.00 [10] [emphasis added]). The term "physical injury" means simply "impairment of physical condition or substantial pain" (Penal Law § 10.00 [9]). Generally, the issue of whether the victim sustained "serious physical injury" as opposed to mere "physical injury" is a question of fact for the jury to determine *(see, People v Greene,* 70 NY2d 860; *People v Rojas,* 61 NY2d 726; *Matter of Philip A.,* 49 NY2d 198). However, the prosecution is required to submit sufficient proof to meet an "objective level" of serious physical injury before the issue may be submitted to the jury *(see, People v McDowell,* 28 NY2d 373, 375).

At trial, Sandiford described his physical condition following the attack as follows, "My eyes [were] swollen up and busted up. The left eye was half-inch closed up. There were black and blue marks all over my body. My head was busted". Despite the pain of his injuries, Sandiford initially declined medical treatment at the scene as well as when he arrived at the 106th Precinct. He eventually agreed to receive treatment at approximately 4:30 A.M. At that time, an emergency medical technician examined Sandiford and observed several contusions on his face, arms, back and legs. Sandiford also had a laceration, contusion and hematoma on the back of his head. His forehead and right eye were swollen and there were bruises around the eye and cheek. The technician placed a splint on Sandiford's left wrist and bandaged the back of his head. Thereafter, Sandiford was transported to Jamaica Hospital for further examination and treatment.

Upon his arrival at the hospital emergency room, Sandiford was examined by Dr. Shaheed Khan. Dr. Khan observed injuries to Sandiford's right eye, left arm, scalp and back. The conjunctiva, i.e., the covering of the cornea in Sandiford's right eye, which is normally transparent, was red, and the

upper and lower lids of the eye were swollen. The doctor also observed blood tinge oozing from the right eye. The visual acuity of the right eye was 20/50 and the left eye was 20/20. The doctor diagnosed Sandiford's condition as traumatic iritis which is an inflammation of the iris of the eye. Antibiotic eyedrops were prescribed for that condition. The laceration on the back of Sandiford's head required five stitches. Dr. Khan stated that the bruises and swelling which he observed on the patient's lower back and left forearm were consistent with being struck by a blunt instrument. The doctor was unable to determine how the remaining injuries were inflicted.

Sandiford was subsequently examined by Dr. William Calloway on December 31, 1986. Dr. Calloway initially examined Sandiford's right eye, which was partially closed due to bruises and swelling, and the white of the eye was red. The pupils of both eyes were equal and reacted to light. The laceration on the back of Sandiford's head was infected and after treating the infection, Dr. Calloway removed the stitches. Several abrasions and contusions were observed on Sandiford's legs and arms. Dr. Calloway, who was concerned that Sandiford had a subdural hematoma, referred Sandiford to an opthalmologist and a general surgeon.

On January 21, 1987, one month after the assault, Sandiford was examined by Dr. John Mitchell, an opthalmologist. At that time, Sandiford's visual acuity in both eyes was 20/20 and the external examination of his eyes was "unremarkable". Upon an internal examination of Sandiford's right eye, however, Dr. Mitchell observed dots or accumulations of white and brownish colored pigment on the back surface of the cornea. Additionally, the physician observed "flares" or cells floating in the anterior chamber of the cornea. Dr. Mitchell diagnosed Sandiford's condition as "iritis" or "keratic precipitates". Dr. Mitchell explained the condition of the right eye in the following way: "you're in a theater and there's smoking that's taking place * * * you see the beam of light of the projector coming down, that would be equivalent to flare and smoke rising through the particles rising through the beam of light would be cells". The doctor also explained that "[t]he cells represent the outpouring from the iris and root of the iris, of protein and white blood cells, which are there as a response to some injury or disease * * * to combat inflammation and to combat infection". Dr. Mitchell opined that Sandiford's condition was caused by a contusion "rather severe in nature" due to a blunt force striking the cornea.

Finally, Dr. Barbara Justice, a surgeon with considerable experience in trauma treatment, examined and treated Sandiford on January 27 and 30, 1987, and again on October 22, 1987. When Dr. Justice first examined Sandiford on January 27th, she observed multiple soft tissue injuries and swelling all over Sandiford's body. In addition to the laceration in the rear of Sandiford's head, Dr. Justice observed swelling and tenderness around the right eye, left forearm and right lower leg. In the doctor's opinion, the injuries, which she stated were quite serious, were approximately one month old and were consistent with being struck with a blunt instrument. Dr. Justice examined the swelling around Sandiford's right eye, which was in the process of dissolving, and observed some hemorrhage in the white area of the eye. The doctor also observed decreased vision in the right eye. On January 27 and 30, 1987, Sandiford advised Dr. Justice that because of the seriousness of the injuries, he was having difficulty walking and lying flat on his back. On October 22, 1987, Sandiford advised the doctor that he continued to suffer spasms in his lower and midback. Sandiford also experienced spasms in the right eye area which were not previously noticeable in January 1987 because of the swelling in the area.

Viewing this testimony in the light most favorable to the People (see, People v Contes, 60 NY2d 620, supra), we conclude that the evidence was legally sufficient to establish that Sandiford sustained serious physical injury within the meaning of Penal Law § 10.00 (10). The evidence established that Sandiford suffered severe trauma to the right eye resulting in an "iritis" condition which existed for more than one month following the assault. Although the iritis condition did not appear to cause decreased visual acuity in Sandiford's eye, according to Dr. Mitchell's testimony it did interfere to some extent with the quality of his vision in that eye. Moreover, the trauma injuries sustained to the external area of Sandiford's right eye, his left forearm, back and legs as well as the laceration in the back of his head were of such a severe nature that they were visible during Dr. Justice's physical examination of Sandiford which took place over a month after the incident. Sandiford continued to suffer spasms in his lower and midback region as well as in the area of his right eye for approximately one year after the attack. We find this evidence, when viewed most favorably to the prosecution, was sufficient to support the jury's determination that Sandiford suffered a "protracted impairment of [his] health" as a result

of the severe beating by the defendants (Penal Law § 10.00 [10]; *see, People v Hall,* 89 AD2d 788).

Moreover, upon the exercise of our factual review power (CPL 470.15 [1]), we conclude that the jury's verdict of guilt was not against the weight of the credible evidence. The jury was charged as to both assault in the first and second degrees and was provided with the statutory definitions of both "serious physical injury" and "physical injury". Based on the evidence recounted above, we cannot conclude that the jury's determination that Sandiford suffered serious physical injury was not supported by the evidence.

SUPPRESSION RULINGS

A. Jason Ladone's Statements

Ladone contends that the custodial confession which was "extracted" from him by the interrogating officers should have been suppressed because the officers effectively cut off all of his avenues of assistance by taking him to the 112th Precinct, rather than the 106th Precinct as they had told his mother they would. Additionally, Ladone asserts that his station house confession was tainted by his previous inculpatory statement made in the custodial setting of the police vehicle prior to the administration of *Miranda* rights.

It has been consistently recognized that "special care must be taken to insure the rights of minors who are exposed to the criminal justice system" *(People v Ward,* 95 AD2d 351, 354; *see also, People v Alaire,* 148 AD2d 731; *People v Ventiquattro,* 138 AD2d 925; *People v Harrell,* 87 AD2d 21), and the police are thus required to "exercise greater care to insure that the rights of youthful suspects are vigilantly observed" *(People v Hall,* 125 AD2d 698, 701). Police conduct which purposely isolates a youthful suspect from his family or other supportive adults in order to secure an inculpatory statement cannot be tolerated *(see, People v Bevilacqua,* 45 NY2d 508; *People v Townsend,* 33 NY2d 37; *People v Hall,* 89 AD2d 788, *supra; People v Butler,* 112 AD2d 1006). In *People v Townsend (supra),* a 17-year-old suspect was interrogated for over five hours without the benefit of *Miranda* warnings, while his mother, who repeatedly telephoned the precinct, was advised that her son was not at that location. The Court of Appeals found, the police conduct "indefensible", and held that "[t]he courts should not accept a confession obtained by the police through tactics calculated to make

certain that the defendant's parents will not take any steps to get him a lawyer" *(People v Townsend, supra,* at 42).

■ In the case at bar, we agree with the hearing court's determination that, unlike *Townsend (supra)* and its companion cases, the facts do not support a finding that the police acted in such a way as to purposely isolate Ladone from his parents or from his attorney. Once Ladone made an inculpatory statement in the police vehicle, he was placed under arrest in his mother's presence. At Mrs. Ladone's request, the officers returned her to her residence and, upon her exiting the police vehicle, the officers advised Mrs. Ladone that they were bringing her son to the 106th Precinct. Moreover, when Mrs. Ladone inquired as to whether her son needed an attorney, the officers advised her that it was her decision. As the hearing court found, the officers' plans to bring Ladone to the 106th Precinct for questioning were subsequently changed when Ladone indicated his willingness to cooperate with the police investigation and view photographs. Upon his arrival at the 112th Precinct at approximately 4:15 P.M., Ladone was advised of his *Miranda* rights and, after he indicated his willingness to answer questions, he made inculpatory oral and written statements. Ladone's statements were made prior to the time that the police were advised that he was represented by counsel. According to the testimony of Ladone's attorney, he did not contact the police precinct until approximately 9:20 P.M., which was well after Ladone made his statement. Thus, this case is clearly distinguishable from *People v Bevilacqua* (45 NY2d 508, *supra),* wherein the police, despite repeated requests of the 18-year-old defendant, did not notify the defendant's mother of her son's arrest until after the defendant made oral and written confessions. Additionally, in *Bevilacqua,* the defendant's attorney telephoned the police precinct after the defendant made his oral statement, but prior to his written statement, and directed the police to cease questioning the defendant; those instructions, however, were ignored. Moreover, the defendant was moved from one police precinct to another and when his attorney eventually arrived, the defendant's location was concealed by the police. Based on the obvious misconduct by the interrogating officers, the Court of Appeals determined that the defendant's statements were subject to suppression.

Unlike *Bevilacqua (supra),* there is an absence of any evidence in this case to indicate that the police officers engaged in a calculated strategy designed to keep Ladone from either

his parents or his attorney. Rather, Ladone was in his mother's presence when he was arrested and his mother was aware of the police officers' identities. The subsequent change in the police officers' plans which resulted in Ladone first being escorted to the 112th Precinct was, as the hearing court found, not a deliberate attempt by the police officers to isolate Ladone but rather was prompted by Ladone's expressed willingness to cooperate with the police.

B. Scott Kern's Statements

Kern similarly argues that his custodial statements to the police officers should have been suppressed since the police officers failed to scrupulously honor his right to remain silent and, in his view, the record is devoid of credible evidence to establish that he had been advised of his *Miranda* rights prior to the investigation. Significantly, in addressing these claims, Kern relies to a large extent on his father's trial testimony, which was not presented at the *Huntley* hearing. The suppression hearing testimony established that Kern was advised of his *Miranda* rights, in his father's presence, before making his statements. Moreover, both the son and his father signed a written waiver of those rights. At trial, however, Mr. Kern, who did not testify at the *Huntley* hearing, testified that when he and his son were first questioned, his son stated that he was not involved and he did not want to answer any of the police officers' questions. Mr. Kern testified that his son eventually made a statement in response to police interrogation but prior to the time that his son was provided with *Miranda* warnings. Kern also notes that on rebuttal, Detective Kelly testified at trial that when he first spoke to Kern and his father about the Howard Beach attack, Kern stated that he did not want to talk about it.

■ To the extent that Kern's claims asserted on appeal are premised upon arguments and testimony which were not presented to the suppression court, they are not preserved for appellate review *(see, People v Riley,* 70 NY2d 523, 531-532; *People v Dodt,* 61 NY2d 408, 416). Moreover, once this evidence was brought to light during the trial testimony of Kern's father and Detective Kelly, it was incumbent on Kern to seek to reopen the suppression hearing for the purpose of inquiring into the circumstances of the interrogation *(see, People v Perez,* 104 AD2d 454, 455-456). No such request was made.

■ Accordingly, based on the evidence adduced at the

suppression hearing, we conclude that Kern's motion to suppress his custodial statements was properly denied. Both Kern and his father freely and voluntarily accompanied the police officers to the precinct on the morning of December 22, 1986, and, at that time, the police did not consider Kern to be a suspect. Once the police were made aware of the fact that Kern had been identified as a participant in the attack, he was immediately advised of his *Miranda* rights, in his father's presence, and both he and his father signed a written waiver of those rights. Thereafter, Kern provided the police with an oral and written statement. Under these circumstances, Kern's statements were properly obtained by the police and, therefore, admissible.

C. Jon Lester's Statements

■ ■ Lester contends that the suppression court erred in ruling that his statements to Officer Ahern and Assistant District Attorney Wolk at the 106th Precinct were admissible because the statements were spontaneously uttered. In addition to his argument that these statements were necessarily tainted by his previous remarks in the police car elicited without *Miranda* warnings, Lester takes the position that Officer Ahern's action in providing him with a newspaper containing front-page coverage of the Howard Beach incident was calculated to provoke a statement from him and, thus, his subsequent statements were involuntarily made. Moreover, Lester contends that his comments to Assistant District Attorney Wolk should have been suppressed because they closely followed a period of intense interrogation and were made after his attorney had contacted the precinct and requested that all questioning of his client cease. We disagree with these contentions.

Once a defendant has invoked his right to counsel, the police must cease any further interrogation of the defendant in the absence of his attorney *(see, People v Cunningham,* 49 NY2d 203). This rule is designed to protect the accused from the coercive power of the State which is intent on prosecuting the defendant for a criminal offense *(see, People v Krom,* 61 NY2d 187, 197; *People v Hobson,* 39 NY2d 479, 483-484). This rule, however, has no application to a spontaneous or unsolicited statement to the police which is in no way the product of an interrogation environment or the result of express questioning or its functional equivalent *(see, People v Stoesser,* 53 NY2d 648, 650), for the police are not obligated to "take

affirmative steps, by gag or otherwise, to prevent a talkative person in custody from making an incriminatory statement" *(People v Kaye,* 25 NY2d 139, 145; *see also, People v Krom, supra,* at 199). The test is whether the "defendant spoke with genuine spontaneity 'and not [as] the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed' " *(People v Stoesser, supra,* at 650, quoting *People v Maerling,* 46 NY2d 289, 302-303; *see also, People v Wade,* 143 AD2d 703, 707), or whether instead the "statement can be said to have been triggered by police conduct which should reasonably have been anticipated to evoke a declaration from the defendant" *(People v Lynes,* 49 NY2d 286, 295).

■ Clearly, in the case at bar, the police officer's conduct in providing Lester with a newspaper, after Lester's repeated insistence to see it, cannot be construed as an attempt by the officer to elicit or provoke an incriminating statement. Thus, this case is clearly distinguishable from *People v Ferro* (63 NY2d 316, *cert denied* 472 US 1007) which is relied upon by Lester. In *Ferro,* the Court of Appeals held that the police conduct in placing in front of the defendant's cell, furs which had been stolen from the deceased victim's apartment and recovered from the codefendant's home, after the defendant declined to answer the officer's questions, constituted the functional equivalent of interrogation and, thus, violated the defendant's constitutional rights. Similarly, *People v Hall* (125 AD2d 698, *supra)* is factually distinguishable since it involved a 15-year-old suspect, who had initially denied committing the crime, but was repeatedly questioned as to his recitation of the events and challenged by the police officers regarding his version of the facts. In *Hall,* the defendant's ultimate confession to the crime was held not to be spontaneous inasmuch as it was "the product of and induced by the interrogation process" *(People v Hall, supra,* at 700). Herein, however, Lester's outburst upon viewing the newspaper was in no way connected to police interrogation, nor can it be said that Officer Ahern's conduct in complying with Lester's request to see the newspaper was calculated to elicit an incriminating statement from Lester.

■ Similarly, Lester's unprovoked and unsolicited remarks to Assistant District Attorney Wolk, who identified himself to Lester, were spontaneous and not subject to suppression. Contrary to Lester's assertion, the Assistant District Attorney was not obligated to refuse to listen to Lester's remarks, for, as the Court of Appeals noted in *People v Kaye* (25 NY2d 139,

145, *supra)* "[t]o require a [law enforcement official] to prevent a prisoner from volunteering a statement, or to prevent the [law enforcement official] from divulging statements spontaneously made to him would stretch the comprehension of the average citizen to the breaking point".

Finally, we reject Lester's assertion that these statements were necessarily tainted by his prior custodial statements which were elicited in the police car. The record reveals that a period of over four hours elapsed between Lester's initial statement and his outburst upon viewing the newspaper, and that Lester was not the subject of continuous police interrogation during this period. Thus, any taint resulting from Lester's earlier remarks which had been suppressed was attenuated *(see, People v Marino,* 135 AD2d 573; *cf., People v Bethea,* 67 NY2d 364). Moreover, following his remarks to Officer Ahern, Lester was given his *Miranda* rights. The subsequent questioning was abruptly terminated when Lester's attorney contacted the precinct. Thereafter, Lester, who was aware that his attorney had requested that the police questioning cease, initiated a conversation with the Assistant District Attorney. In view of the voluntary nature of Lester's remarks coupled with the fact that there had been a definite and pronounced break in the police interrogation *(see, People v Chapple,* 38 NY2d 112, 115; *People v Marino, supra; People v Steed,* 133 AD2d 433), it cannot be said that these remarks were tainted by Lester's earlier statements which had been suppressed. Thus, the hearing court did not err in denying the suppression of Lester's voluntary and spontaneous remarks made to Officer Ahern and Assistant District Attorney Wolk.

APPLICATION OF *BATSON V KENTUCKY* TO THE DEFENSE

During the jury selection process, an issue arose as to whether the rule of *Batson v Kentucky* (476 US 79), which prohibits the prosecution from exercising its peremptory challenges in a racially discriminatory manner, applies equally to the defense. Upon an application by the prosecution, the trial court ruled, during the course of the voir dire, that the *Batson* rule did apply to the defense, and, upon finding a prima facie case of discriminatory use of peremptory challenges on the basis of race, the court required the defense to provide race-neutral explanations for the exercise of its remaining peremptory challenges against black jurors. Of the 12 jurors and 2 alternates who were impanelled, only one black individual was seated as a regular juror due to the failure of the defense

to proffer a racially neutral reason for its peremptory challenge directed at that juror. That juror, however, was ultimately discharged on consent of both sides immediately following the prosecutor's summation because the juror's son had suddenly been taken ill. The first alternate juror, who had been agreed upon by all parties during the voir dire, was then seated as a regular juror. In view of these circumstances, the defendants' contention that the trial court's ruling was erroneous is essentially moot inasmuch as the defendants were not ultimately aggrieved by the ruling. However, we find that the question posed by the defendants—i.e., whether *Batson v Kentucky (supra)* applies equally to the exercise of peremptory challenges by the defense—is one of integral importance to the criminal justice system which recurs on a continual basis and often evades appellate review *(see, Matter of Westchester Rockland Newspapers v Leggett,* 48 NY2d 430; *Matter of Storar,* 52 NY2d 363, 369-370; *Matter of Gannett Co. v De Pasquale,* 43 NY2d 370, 376). Accordingly, we take this opportunity to address the issue.

A. "Reverse-*Batson*"

Factual Background

After the trial court conducted general and individual voir dire questioning of the first venire panel, the court, outside the jury's presence, entertained challenges for cause. At that time, the defense was successful in challenging 1 of the 4 black jurors on the panel. Challenges for cause by the defense to 2 of the 3 remaining black jurors were denied. After the remaining jurors were questioned by counsel, the defense made an application for eight additional peremptory challenges. The basis of the application was that, in defense counsel's view, the black jurors did not "want to be excused. They're coming in here, volunteering", whereas the white jurors "who aren't anxious to serve are using all kinds of excuses to get off any duty". Thus, the defense maintained that the jury panel did not represent a fair cross section of the community. This application, as well as that for similar relief based on the fact that there were multiple defendants, was denied.

The court thereafter entertained challenges for cause and peremptory challenges to the group of jurors which counsel had previously questioned. From that group, the defense was unsuccessful in challenging a black female juror for cause.

The defense then peremptorily challenged that black female juror as well as the other two black jurors which the defense had previously sought to challenge for cause. At this point during the voir dire, the prosecution asserted that the defense was systematically excluding black jurors from the panel in violation of the tenets of *Batson v Kentucky* (476 US 79, *supra*). The prosecutor pointed out that of the three black jurors who were on the jury panel, all had been excluded by the defense through the exercise of peremptory challenges. The court denied the application at that time as being premature.

When the jury-selection process continued the next day, the court conducted general questioning of an additional panel of jurors. Before the court commenced its individual questioning of those jurors, the defense requested that the trial court pose a multiple choice question to the jurors which was designed to elicit answers indicating whether the jurors were anxious to serve. Although the court declined to pose the specific question proposed by the defense, it did agree to ask the jurors whether they were anxious to serve. During the subsequent voir dire, the defense requested that the trial court inquire of two black jurors whether they would have to answer to their respective communities if they voted to acquit the defendants. The trial court declined the request, although the court did inquire of the second black juror whether she would have to answer to her neighbors as to any verdict which might be rendered.

The following morning, the prosecution renewed its application pursuant to *Batson v Kentucky* (476 US 79, *supra*). The prosecution cited the defendants' application for additional peremptory challenges, the defendants' prior exercise of peremptory challenges to exclude all black jurors, the questions which the defense sought to have presented to the jurors concerning their willingness to serve and regarding the pressure, if any, that black jurors might feel from their respective communities. The prosecutor maintained that this conduct clearly reflected an intent on the part of the defense to exclude blacks from the jury panel. In view thereof, the prosecutor sought an order directing that any further exercise of peremptory challenges by the defense against black jurors could only be effectuated upon a showing by the defense of a racially neutral explanation for the challenge. The defense vigorously opposed the application, arguing that peremptory challenges are one of the basic rights afforded to any defen-

dant and that there was no authority for placing a restriction or limitation on the exercise of that right. Noting that the *Batson* ruling was based on equal protection principles, the defense maintained that the State "does not need equal protection". Moreover, citing the Sixth Amendment (US Const 6th Amend), the defense asserted that "[t]he accused has the right to a trial by jury, not the [S]tate". The court reserved its decision on the prosecutor's application and continued its individual voir dire of the remaining jurors. At the conclusion of the court's questioning the next day, the court entertained challenges for cause from both sides. The defense challenged six black jurors for cause. One of the challenges was granted on consent but the remaining five were denied. The counsel then conducted their questioning of the remaining jurors.

On the next day of jury selection, the trial court rendered its decision and ruled that the principles set forth in *Batson v Kentucky* (476 US 79, *supra)* were applicable to the defense. The court ruled further that the prosecution had made out a prima facie case that the defense was using its peremptory challenges to strike jurors solely on the basis of racial bias. With respect to the appropriate remedy to be applied, the court held that "to disallow the jurors already selected, to discharge the panel and begin anew the jury selection process, under the circumstances of this case would lead to mistrials ad infinitum". Accordingly, the court ruled that defense counsel would be directed to explain all of its subsequent peremptory challenges of black jurors and articulate race-neutral reasons for those challenges. The defendants immediately instituted a proceeding pursuant to CPLR article 78 in this court seeking to prohibit the enforcement of the trial court's "reverse-*Batson"* order. This court dismissed the proceeding, stating, *inter alia,* "prohibition does not lie in this case because of the availability of an adequate remedy at law, i.e., appeal" *(Matter of Ladone v Demakos,* 133 AD2d 435, 436, *lv denied* 70 NY2d 607).

When jury selection resumed, the court then entertained peremptory challenges to the panel of jurors which previously had been questioned by counsel and had been the subject of challenges for cause. At that time, the defense exercised challenges against seven black jurors. One of the challenged black jurors was excused without explanation and three of those remaining were discharged after the defense offered racially neutral explanations in support of those challenges. Although the court found the proffered explanations as to two

of the other challenged black jurors to be unsatisfactory, it eventually dismissed those jurors for other reasons. Only one of the seven peremptory challenges exercised by the defense against the black jurors was denied. That individual was seated as a juror and thereafter sworn.

Following an examination of additional jurors by the court and counsel, four of whom were blacks, one of the black jurors was dismissed on consent, a second was excused by the court upon the exercise of the defendant's peremptory challenge without the need for a race-neutral reason, and the remaining two black jurors, who were also the subject of peremptory challenges by the defense, were excused after the defense provided racially neutral explanations. Following further voir dire, the twelfth juror was seated and the entire jury panel was sworn. The parties thereafter chose alternates on consent.

### *Batson v Kentucky* Ruling

The issue of whether peremptory challenges may be exercised in a racially discriminatory manner was addressed by the United States Supreme Court in *Swain v Alabama* (380 US 202), which involved a black defendant's claim of an Equal Protection Clause violation due to the prosecutor's exercise of peremptory challenges to exclude black jurors. The *Swain* court determined, consistent with its prior holdings in *Strauder v West Virginia* (100 US 303) and *Carter v Texas* (177 US 442), that purposeful and deliberate exclusion of black jurors solely on account of race and wholly unrelated to the issues of the particular case on trial, was violative of the Equal Protection Clause. The *Swain* court explained further, however, that in view of the integral and important role which peremptory challenges play in the jury selection process, a prosecutor's exercise of peremptory challenges to exclude blacks from sitting as jurors in any particular case would be presumed valid. If, however, a prosecutor was shown to have "consistently and systematically" struck blacks from the venire "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be", so as to prevent them from ever serving on a petit jury, the trial court could infer that blacks were being denied "the same right and opportunity to participate in the administration of justice enjoyed by the white population" *(Swain v Alabama, supra,* at 223-224). If the prosecutor was unable to refute that inference, his actions, under the *Swain* analysis, would be deemed to be a violation of the Equal Protection Clause.

The *Swain* ruling was the subject of widespread criticism and during the period between 1965 and 1986, when *Batson v Kentucky* (476 US 79, *supra)* was decided, some Federal courts sought to avoid the *Swain* ruling by applying the Sixth Amendment to proscribe the discriminatory exercise of the prosecution's peremptory challenges *(see, e.g., Booker v Jabe,* 775 F2d 762, *vacated sub nom. Michigan v Booker,* 478 US 1001, *on reconsideration judgment reinstated* 801 F2d 871, *cert denied* 479 US 1046; *McCray v Abrams,* 750 F2d 1113, *vacated* 478 US 1001).* Similarly, several State courts looked beyond *Swain* in construing their own State constitutional guarantees of trial by jury to prevent prosecutors from exercising their peremptory challenges against jurors solely on the basis of race *(see, e.g., People v Thompson,* 79 AD2d 87; *People v Wheeler,* 22 Cal 3d 258, 583 P2d 748; *Commonwealth v Soares,* 377 Mass 461, 387 NE2d 499, *cert denied* 444 US 881; *State v Neil,* 457 So 2d 481 [Fla]).

In *Batson v Kentucky* (476 US 79, *supra),* the Supreme Court ultimately relieved defendants of what it termed the "crippling burden of proof" *(Batson v Kentucky, supra,* at 92) imposed by *Swain* and set forth new standards for assessing claims of discriminatory jury selection by a prosecutor in the exercise of peremptory challenges. Thus, the *Batson* court held that, "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial" *(Batson v Kentucky, supra,* at 96). To establish such a prima facie case, the defendant must show that he or she is a member of a cognizable racial group and that the prosecution has exercised its peremptory challenges to remove from the venire members of the defendant's racial group. In connection with this showing, the *Batson* court noted that the defendant is entitled to rely on the fact that peremptory challenges, by definition, permit " 'those to discriminate who are of a mind to discriminate' " *(Batson v Kentucky, supra,* at 96, quoting *Avery v Georgia,* 345 US 559, 562). Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecution has exercised its peremptory challenges to exclude members of the defendant's group solely on account of their race. The *Batson* court further noted that in deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances including a pattern of strikes against black jurors in the particular

venire, the prosecutor's questions and statements during the voir dire, as well as the trial court's own experience in supervising voir dire *(Batson v Kentucky,* 476 US 79, 96-97, *supra).* Once a prima facie showing has been made by the defendant, the burden shifts to the State to come forward with a racially neutral explanation for challenges of black jurors. The *Batson* court explained that "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. * * * The core guarantee of equal protection, ensuring citizens that their State will not discriminate on account of race, would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the juror's race" *(Batson v Kentucky, supra,* at 97-98). The *Batson* court declined to express any view on what appropriate action a trial court should take in the event the prosecution fails to rebut a defendant's prima facie showing of racial discrimination in the use of peremptory challenges *(Batson v Kentucky, supra,* at 99, n 24). Thus, the *Batson* court provided the various Federal and State trial courts with flexibility to tailor the appropriate corrective action, given the facts and circumstances of the particular case before them.

Significantly, the *Batson* court emphasized that its holding was necessary not only to protect the equal protection rights of the defendant, but also to protect the interests of the excluded jurors and the community-at-large. Thus, the Supreme Court stated:

"Racial discrimination in selection of jurors harms not only the accused whose life or liberty they are summoned to try. Competence to serve as a juror ultimately depends on an assessment of individual qualifications and ability impartially to consider evidence presented at a trial. * * * A person's race simply 'is unrelated to his fitness as a juror.' * * * As long ago as *Strauder* [100 US 303], therefore, the Court recognized that by denying a person participation in jury service on account of his race, the State unconstitutionally discriminated against the excluded juror. * * *

*"The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. * * * Discrimina-*

*tion within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others' " (Batson v Kentucky, 476 US 79, 87-88, supra* [emphasis added]).

Equally significant is the fact that the *Batson* court left unresolved the question of whether a defendant's exercise of peremptory challenges would similarly be subject to the strictures of the Equal Protection Clause *(Batson v Kentucky, supra,* at 89, n 12) and the Supreme Court only recently declined to address the issue in *Alabama v Cox* (— US —, 109 S Ct 817; 102 L Ed 2d 806). Interestingly, however, former Chief Justice Burger, in his dissenting opinion in *Batson,* viewed as inevitable the extension of the *Batson* ruling to the defense when he noted, "[o]nce the Court has held that *prosecutors* are limited in their use of peremptory challenges, could we rationally hold that defendants are not?" *(Batson v Kentucky, supra,* at 126; *see also,* at 108 [concurring opn per Marshall, J.].) Several courts, including several trial courts in this State, and legal commentators on this subject have agreed with this reasoning and have applied, or have urged the application of, the *Batson* ruling to the defense *(see, People v Gary M.,* 138 Misc 2d 1081 [Kramer, J.]; *People v Muriale,* 138 Misc 2d 1056 [Juviler, J.]; *People v Piermont,* 143 Misc 2d 839 [Carey, J.]; *People v Davis,* 142 Misc 2d 881 [Fried, J.]; *Maloney v Washington,* 690 F Supp 687; *Chew v State,* 71 Md App 681, 527 A2d 332; Note, *Discrimination by the Defense: Peremptory Challenges After Batson v Kentucky,* 88 Colum L Rev 355 [1988]; Fisher, *Batson v Kentucky: Purposeful Discrimination in Jury Selection,* NYLJ, Nov. 3, 1988, at 1, col 1, *and* Nov. 4, 1988, at 6, col 4; *contra, Holtzman v Supreme Ct.,* 139 Misc 2d 109; Note, *Defendant's Discriminatory Use of the Peremptory Challenge After Batson v Kentucky,* 62 St John's L Rev 46 [1987]; *see also,* Preiser, Supp Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 270.25, at 209 [1989 Pocket Part]). Additionally, some courts have also extended the *Batson* ruling to jury selection in civil cases *(see, Taylor v Fisher Liberty Co.,* Sup Ct, NY County, Dec. 1, 1988, White, J.; *Fludd v Dykes,* 863 F2d 822; *Edmonson v Leesville Concrete Co.,* 860 F2d 1308; *contra, Esposito v Buonome,* 642 F Supp 760; *see also, Wilson v Cross,* 845 F2d 163).

State Action

█ The defendants herein, as well as the Legal Aid Society,

which was granted permission to file an *amicus curiae* brief on this issue, take the position that the strictures of the *Batson* ruling cannot be applied to the defense since the threshold requirement of the Equal Protection Clause, namely, State action, is absent when a defendant, rather than the State, exercises his or her peremptory challenges to strike a juror. We disagree.

"[T]he principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment [US Const 14th Amend ('No State shall * * * deny to any person within its jurisdiction the equal protection of the laws')] is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful" *(Shelley v Kraemer,* 334 US 1, 13). Notably, the State action requirement of the New York State Constitution (NY Const, art I, § 11) is synonymous with that of the Fourteenth Amendment *(Under 21, Catholic Home Bur. for Dependent Children v City of New York,* 65 NY2d 344, 360, n 6). Moreover, it has been recognized that the concept of State action is "an elusive principle not reducible to ritualistic incantations or precise formalism *(see, Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, 158, *supra* [citing *Burton v Wilmington Parking Auth.,* 365 US 715, 722]; *see also,* Tribe, American Constitutional Law, *op. cit.,* at 1148-1149)" *(SHAD Alliance v Smith Haven Mall,* 66 NY2d 496, 505). The general standard for determining whether private conduct constitutes State action is whether that conduct can be deemed to be "fairly attributable to the State" *(Lugar v Edmondson Oil Co.,* 457 US 922, 937; *see also, Matter of Wilson,* 59 NY2d 461, 476). The various factors which have been identified as relevant to the State action issues are: the source of authority for the private action, whether the State is so entwined with the regulation of the private conduct as to constitute State activity, whether there is meaningful State participation in the activity, and whether there has been a delegation of what has traditionally been a State function to a private person *(see, Melara v Kennedy,* 541 F2d 802, 805). "As the test is not simply State involvement, but rather significant State involvement, satisfaction of one of these criteria may not necessarily be determinative to a finding of State action" *(SHAD Alliance v Smith Haven Mall, supra,* at 505, quoting *Sharrock v Dell Buick-Cadillac,* 45 NY2d 152, 158). However, "[p]rivate discrimination may violate equal protection of the law when

accompanied by State participation in, facilitation of, and, in some cases, acquiescence in the discrimination" *(Matter of Wilson, supra,* at 476; *Moose Lodge No. 107 v Irvis,* 407 US 163).* And, "where *racial* discrimination by a private actor is involved, a lesser degree of State involvement than would otherwise be required will support a finding of 'State action' " *(Under 21, Catholic Home Bur. for Dependent Children v City of New York, supra,* at 363 [emphasis added]).

The source of the authority for the defendants' exercise of racially discriminatory peremptory challenges is State law since peremptory challenges are not constitutionally mandated but rather exist solely by reason of State statute *(see,* CPL 270.25). Moreover, as noted by several trial courts in dealing with this very issue *(see, People v Muriale,* 138 Misc 2d 1056, *supra; People v Gary M.,* 138 Misc 2d 1081, *supra; People v Davis,* 142 Misc 2d 881, *supra),* the State is intimately involved in the jury selection process. The jurors are summoned to appear for jury duty by the County Clerk or Commissioner of Jurors *(see,* Judiciary Law § 516) and are subject to monetary sanctions in the event that they fail to appear *(see,* Judiciary Law § 527). The jurors report to a public courthouse where, under the supervision of a Trial Judge and various court personnel, they are questioned by counsel. Outside the presence of the jurors, the counsel have an opportunity to raise challenges for cause against any jurors and, following the court's ruling on those challenges, counsel are free to exercise their respective peremptory challenges. Thereafter, in open court, the Trial Judge dismisses those jurors who are either successfully challenged for cause or were peremptorily challenged.

Under these circumstances, it cannot be said that when the defense exercises its peremptory challenges in a racially discriminatory manner, the State is merely an observer of the discrimination as opposed to a significant participant in the activity. Rather, the State, by means of the exercise of real and apparent judicial authority in excusing the challenged juror, directly effects the defendant's discriminatory act *(see, Matter of Wilson, supra,* at 476; *Shelley v Kraemer,* 334 US 1, *supra).* Indeed, "[j]ustice would * * * be blind if it failed to recognize that the [trial] court is employed as a vehicle for racial discrimination when peremptory challenges are used to exclude jurors because of their race. The government is inevitably and inextricably involved as an actor in the process by which a [trial] judge, robed in black, seated in a paneled

courtroom, in front of an American flag, says to a juror, 'Ms. X, you are excused' " *(Edmonson v Leesville Concrete Co.,* 860 F2d 1308, 1313, *supra).* Viewed from the perspective of the excused juror, it clearly appears that the trial court, and through it the State, is directing him or her to leave the courtroom. To this extent, this situation can be likened to the case of *Burton v Wilmington Parking Auth.* (365 US 715) wherein the Supreme Court held that the exclusion of a black would-be patron from a restaurant located on a State-owned and operated parking facility was State action even though the decision to do so was made by the restaurant operator, a private concern *(see also, Shelley v Kraemer,* 334 US 1, *supra* [enforcement by a State court of a racially restrictive covenant in a private deed violated equal protection]).

. Additionally, to permit the defense to peremptorily strike jurors solely on the basis of race would necessarily and inevitably lead to injury to the jury system, injury to the law as an institution and injury as well to the democratic ideals reflected in the processes in our courts *(see, Ballard v United States,* 329 US 187), a concern which was specifically cited by the *Batson* court as a basis for its ruling prohibiting similar challenges by prosecutors. As noted *supra,* the *Batson* court found that discriminatory peremptory challenges by the prosecutor violated equal protection rights of three beneficiaries, namely, the defendant, the excluded juror and the community-at-large. In situations where the defense seeks to exercise peremptory challenges in a similar discriminatory manner, the same injury to the interest of the excluded juror and the community-at-large occurs. Such insidious racial discrimination, which appears to be countenanced by the State when the challenged juror is excused by the Judge, flies in the face of the underlying purpose of the Equal Protection Clause and the policy considerations set forth by the Supreme Court in *Batson.* The excluded juror challenged solely on the basis of race will have been deprived of his or her right to participate in our system of justice. If the courts were to allow jurors to be excluded from the petit jury solely because of their race, be it at the hands of the State or the defense, they would be willing participants in a scheme which would undermine the very foundation of our criminal justice system and society's confidence therein. Such activity cannot be condoned. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect" *(Palmore v Sidoti,* 466 US 429, 433).

## Common Membership Requirement

■ Having found that sufficient indicia of State action exist in cases where a defendant exercises peremptory challenges in a racially discriminatory manner, our attention next turns to the defendants' contention that since the State, i.e., the prosecution, is not a member of the cognizable racial group sought to be excluded from the petit jury by a defendant's exercise of peremptory challenges, the "common membership" requirement of *Batson* is not satisfied. The common membership requirement identified in *Batson*, which is inherent in any equal protection claim *(see, e.g., Castaneda v Partida,* 430 US 482; *Hernandez v Texas,* 347 US 475, 478-479; *People v Wells,* 89 AD2d 1020, *affd* 60 NY2d 403), essentially constitutes an issue of standing; that is, does the State have standing to assert the rights of the excluded jurors and the community-at-large, which, as explained *supra,* are necessarily infringed upon when a defendant exercises peremptory challenges in a discriminatory manner *(Batson v Kentucky,* 476 US 79, 87, *supra; People v Gary M.,* 138 Misc 2d 1081, 1091, *supra).* We find that the State has standing in these circumstances under the principles of third-party standing.

Three factors which are relevant in determining whether the principle of third-party standing applies in a particular case are (1) the presence of some substantial relationship between the party asserting the claim and the rightholder, (2) the impossibility of the rightholder asserting his own rights, and (3) the need to avoid a dilution of the parties' constitutional rights *(Griswold v Connecticut,* 381 US 479; *National Assn. for Advancement of Colored People v Alabama ex rel. Patterson,* 357 US 449; *Eisenstadt v Baird,* 405 US 438; Note, *Standing to Assert Constitutional Jus Tertii,* 88 Harv L Rev 423, 425 [1975]). Applying these factors to the situation at bar, we find, in the first instance, that the State has a substantial relationship with the excluded jurors and the community-at-large, since the State has a direct interest in protecting the rights of its citizens *(see, People v Gary M.,* 138 Misc 2d 1081, 1092, *supra).* Secondly, the rights of those infringed upon will not be asserted by anyone other than the State, since the excluded juror in almost every instance, is unaware that he or she has been discriminated against when he or she is dismissed by the court. Such discrimination does not become apparent until a significant number of similarly situated jurors are excused, and the first excluded juror is not present when the pattern of discrimination unfolds and becomes ap-

parent. Moreover, the excluded juror is without recourse to complain to the particular Trial Judge since the dismissed juror is not a party to the litigation *(see, People v Gary M.,* 138 Misc 2d 1081, 1092, *supra; People v Davis,* 142 Misc 2d 881; *People v Irizarry,* 142 Misc 2d 793, 809-813 [dealing with the defendant's challenge to prosecutor's discriminatory use of peremptory challenges based on gender]). Finally, in view of the unlikelihood of anyone other than the State asserting the rights of the excluded jurors and those of the community, these rights would likely be severely diluted or adversely affected unless the State were permitted to seek vindication thereof in the context of a particular case.

NY Constitution, Article I, § 11

 In addition to finding that the racially discriminatory exercise of peremptory challenges by the defense constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment (US Const 14th Amend), we find that such practices also violate article I, § 11 of the NY Constitution. That provision states, "No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person * * * or by the state or any agency or subdivision of the state". The second sentence of article I, § 11 is a civil rights provision and is intended to protect rights which are "elsewhere declared", i.e., "the provision * * * [is] not self-executing [but requires] legislative implementation to be effective" *(Dorsey v Stuyvesant Town Corp.,* 299 NY 512, 531). "[T]he civil rights protected by [this] clause in question [are] those already denominated as such in the Constitution itself, in the Civil Rights Law or in other statutes" *(Dorsey v Stuyvesant Town Corp., supra,* at 531). The New York State Constitution guarantees to each individual in this State the rights and privileges of citizenship, which necessarily encompasses the right to serve on a petit jury *(see,* NY Const, art I, § 1; *Thiel v Southern Pac. Co.,* 328 US 217, 224; *People v Briggins,* 67 AD2d 1004, 1006 [Titone, J., dissenting], *revd* 50 NY2d 302; *People v Gary M.,* 138 Misc 2d 1081, 1094-1095, *supra).* Civil Rights Law § 13 also provides that "[n]o citizen of the state possessing all other qualifications which are or may be required or prescribed by law, shall be disqualified to serve as a * * * petit juror in any court of this state on account of race". Additionally, Judiciary Law § 500 provides, "all eligible citi-

zens shall have the opportunity to serve * * * on petit juries in the courts of this state". In view of the foregoing constitutional and statutory provisions, we agree with the reasoning adopted in *People v Gary M.* (138 Misc 2d 1081, *supra)* and *People v Davis* (142 Misc 2d 881, *supra)* which recognizes that every citizen of this State possesses a civil right to serve on a petit jury and that those rights are violated when either the defense or the State exercises peremptory challenges in a racially discriminatory manner.

Conclusion

Accordingly, in view of the foregoing analysis, we conclude that the *Batson v Kentucky (supra)* ruling applies not only to the prosecution, but to the defense as well, and that when the defense exercises its peremptory challenges to systematically exclude blacks from a jury solely on the basis of their race, the Equal Protection Clause of the Federal (US Const 14th Amend) and State (NY Const, art I, § 11) Constitutions are violated. Moreover, when such a violation occurs, the prosecution, based on the principles of third-party standing, has the requisite standing to assert the equal protection claim on behalf of the excluded juror and the community-at-large. As stated previously, peremptory challenges exercised solely on the basis of race, whether it be by the prosecution or the defense, necessarily result in injury not only to the excluded juror, but to the community-at-large and to society's confidence in and respect for our system of justice. In this regard, essentially at stake is the integrity of the court system. For a court to prohibit the use of prosecutorial peremptory challenges based solely on racial discrimination while remaining silent in the face of similar racially discriminatory conduct by the defense, strikes at the very core of our system of justice and the fundamental concept of fairness. Thus, when racially motivated peremptory challenges are exercised by either the prosecution or the defense, the courts cannot permit such conduct; justice cannot remain blindfolded, but rather must proclaim and insist that the quarantee of equal protection against all forms of racial discrimination, particularly in our system of justice, be enforced.[2]

---

2. In view of our conclusion that the exercise of peremptory challenges by the defense in a racially discriminatory manner violates the Equal Protection Clause of the Federal and State Constitutions, we do not reach the issue of whether the defense also violated the principles of the Sixth Amendment of the US Constitution and article I § 1 of the NY Constitution which guarantee the right to a trial by an impartial jury.

## B. The Trial Court's "Reverse-*Batson*" Ruling

The defendants also claim that the trial court, after reaching the conclusion that the principles of *Batson v Kentucky* (476 US 79, *supra)* apply equally to the defense, should have given them the opportunity to articulate race-neutral reasons for their previously exercised peremptory challenges against black jurors before it ruled that the prosecution had established that the defense was systematically excluding blacks from the jury panel solely on the basis of race through the exercise of peremptory challenges. The defendants argue that, in doing so, the trial court failed to follow the procedures set forth in *Batson v Kentucky (supra)* before it imposed upon the defense the requirement that it provide race-neutral reasons for peremptory challenges against black jurors which it might thereafter exercise. We disagree. The transcript of the voir dire clearly establishes that shortly after the prosecution made its "reverse *Batson*" application, the Trial Judge inquired of the defense whether it intended to offer any opposition to that portion of the prosecution's motion which asserted that the defense was systematically excluding blacks from the jury solely on the basis of race through the exercise of peremptory challenges. Defense counsel advised the court that they had no intention of responding to that claim. Accordingly, it is clear that the trial court did, in fact, comply with the procedure set forth in *Batson v Kentucky* (476 US 79, *supra).*

Moreover, we conclude that the trial court's finding that the defense was systematically excluding black jurors from the jury panel solely on the basis of race by the use of peremptory challenges, was supported by the record. The reasons for the exercise of peremptory challenges by the defense against black jurors were made known by the defense early in the voir dire. Additionally, since many of the black jurors who were peremptorily struck by the defense had previously been unsuccessfully challenged for cause, the court had an appreciation of the underlying rationale for the defendant's peremptory challenges *(see, Batson v Kentucky, supra,* at 97; *People v Simpson,* 121 AD2d 881, 882, n 1). Finally, the experienced Trial Judge observed the jury selection procedure, was able to assess counsels' questions and statements during voir dire and was fully aware that the defense had been successful up to that point in excluding all of the black jurors from the venire through a combination of challenges for cause and the exercise of peremptory challenges. Accordingly, even

in the absence of a declaration of intent by defense counsel, the trial court's finding that the prosecution established a prima facie showing of systematic racial discrimination by the defense in the exercise of its peremptory challenges was proper and clearly supported by the record.

 Finally, we reject the assertion that because of the racially motivated nature of the attack involved in this case, the defendants should have been able to exercise their peremptory challenges against any black juror solely on the basis of race, including those who, during voir dire questioning, stated that their race would not influence their ability to render an impartial verdict. Although the Supreme Court in *Swain v Alabama* (380 US 202, *supra)* condemned only those racially based peremptory challenges which were wholly unrelated to the issues of the particular case, no such limitation was imposed by the Supreme Court in *Batson v Kentucky* (476 US 79, *supra).* Moreover, the *Batson* ruling clearly reflects an intention to prohibit *all* racially based peremptory challenges, including those which are related to the issues of a particular case, because of the resultant harmful effects of these challenges, namely, the adverse effect on the interest of the excluded juror to participate in jury service and the undermining of public confidence in a system of justice which would permit or condone racial discrimination in the jury selection process.

MISCELLANEOUS TRIAL RULINGS

 The defendants contend that the trial court's evidentiary ruling permitting the prosecution to introduce into evidence a redacted tape recording of Theresa Fisher's telephone call to the 911 emergency police operator on the morning of December 20, 1986, constituted error. The trial court admitted the tape recording into evidence under the present sense impression exception to the hearsay rule. Although the defendants' position may have merit *(see,* Proposed NY Code of Evidence § 804 [b] [1], Comment, at 211-212 [1982] [declarant must be unavailable]; *see also,* McLaughlin, *New York Trial Practice,* NYLJ, June 12, 1981, at 1, col 1, at 2, col 2; *but see,* Fed Rules Evid, rule 803 [1], Advisory Committee Notes, reprinted at 28 USCA, Fed Rules Evid, at 277 [declarant's unavailability not required]; *see generally, People v Watson,* 109 Misc 2d 71, *revd* 100 AD2d 452, *on remand* 127 Misc 2d 439; *People v Jimenez,* 102 AD2d 439; *People v Luke,* 136 Misc 2d 733; Richardson, Evidence § 285-A, at 125-126 [Prince 10th

ed, 1972-1985 Cum Supp]; Barker, *Evidence, 1984 Survey of N.Y. Law,* 36 Syracuse L Rev at 281, 307-308 [1985]), we find that the error, if any, was harmless in view of the overwhelming proof of the defendants' guilt.

■ Additionally, we reject the defendants' assertion that their severance motions were improperly denied since the introduction of their inculpatory statements were violative of their constitutional right of confrontation *(see, Bruton v United States,* 391 US 123). Each of the defendants' statements was redacted to avoid any references to the defendants and, thus, the statements as received into evidence were neither facially nor inferentially incriminating *(see, Richardson v Marsh,* 481 US 200). In fact, given the involvement of approximately a dozen youths in the attack, the redaction of the specific references to the defendants and the inserted references to the "others" or "another" clearly did not prejudice these three defendants *(see, e.g., People v Marcus,* 137 AD2d 723). Additionally, the trial court gave a proper limiting instruction to the jury concerning the use of each of the defendant's statements against the remaining codefendants *(see, Richardson v Marsh, supra; People v Marcus, supra; cf., People v Ayala,* 142 AD2d 147, 170).

■ Similarly unavailing is the defendants' challenge to the trial court's refusal to charge assault in the third degree (Penal Law § 120.00 [1]) as a lesser included offense of assault in the first degree (Penal Law § 120.10 [1]) with regard to the attack on Cedric Sandiford in the vicinity of 156th Avenue. The defendants' challenge to the denial of a jury charge on this point is foreclosed by reason of the jury's verdict of guilt as to the assault in the first degree counts and its implicit rejection of the charged lesser included offense of assault in the second degree (Penal Law § 120.05 [2]; *see, People v Boettcher,* 69 NY2d 174, 180; *People v Feris,* 144 AD2d 691; *People v Carter,* 137 AD2d 826). In any event, the trial court properly declined to charge assault in the third degree as a lesser included offense since no reasonable view of the evidence would support the conclusion that Sandiford's injuries were not inflicted by the use of dangerous instruments, to wit, bats and tree limbs as utilized herein *(see,* CPL 300.50 [1]).

### III. CONCLUSION

Having reviewed the defendants' contentions, we conclude that the judgments of conviction should be affirmed. The

evidence adduced at trial was legally sufficient to establish that the defendants, by relentlessly chasing Michael Griffith through the streets of Howard Beach, onto the Belt Parkway, created a grave risk of death to Griffith which the defendants consciously disregarded and that, by doing so, the defendants grossly deviated from the standard of conduct reasonable persons would have observed in that situation. Moreover, the defendants' conduct was a sufficiently direct cause of the resultant death to support the verdict of guilt for manslaughter in the second degree. Additionally, we find that the evidence regarding the extent and severity of the injuries sustained by Cedric Sandiford due to the continued beating by the defendants was legally and factually sufficient to support a finding of "serious physical injury" within the meaning of Penal Law § 120.10 (1) and § 10.00 (10). Further, we find that the defendants were not prejudiced by the trial court's "reverse-*Batson*" ruling since the only black juror who was seated as a result of the failure of the defense to provide a race-neutral reason for its peremptory challenge to that juror was excused prior to the jury deliberations. In any event, the trial court's ruling was proper in all respects. Racial discrimination from any direction, whether it be the prosecution or the defense, will not be countenanced in our system of justice, either substantively or procedurally.

With regard to the defendants' claims that their respective sentences should be reduced, we find that the imposed terms of imprisonment were neither harsh nor excessive under the circumstances of this case. The defendants' vicious and wanton conduct, which was motivated solely by the color of the victims' skin, and which resulted in the senseless death of Michael Griffith and the savage beating of Cedric Sandiford cannot, and will not, be condoned nor trivialized. The defendants showed absolutely no remorse for their actions when they chased Griffith onto the Belt Parkway and observed him being struck by a passing motorist. Rather, undaunted by their observations of Griffith's traumatic death, the defendants regrouped and continued their relentless pursuit of Sandiford and inflicted serious physical injuries upon him. All for the sole reason of racial differences. A message loud and clear must go forth that racial violence by any person or group, whatever their race, will not be tolerated by a just and civilized society, and that, when it does occur, it must be appropriately punished. Each of the defendants displayed an inexplicable callousness for Michael Griffith's life as well as

the physical well-being of Cedric Sandiford and they must be held accountable for their actions. In view thereof, we do not find an improvident exercise of discretion by the sentencing court and, thus, we decline to disturb the imposed sentences.

We have reviewed the defendants' remaining contentions and find them to be unpreserved for appellate review and/or without merit.

Accordingly, the judgments of conviction should be affirmed.

MANGANO, BROWN, KOOPER and SPATT, JJ., concur.

Ordered that the judgments are affirmed; and it is further,

Ordered that the matters with respect to Scott Kern and Jason Ladone are remitted to the Supreme Court, Queens County, for further proceedings pursuant to CPL 460.50 (5).